AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

## for the
### Eastern District of Virginia

D C C 1 4 2017

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
2750 Green Ash Loop #404, Woodbridge, Virginia 22192, )    Case No.1:17sw830
which is an apartment located in a four-story apartment )
building. )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____Eastern_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § § 841(a)(1) , 846 | Conspiracy to distribute controlled substances. |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

  AUSA Carina A. Cuellar

_____
*Applicant's signature*

Michael A. Fernald, ATF Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

/S/
Theresa Carroll Buchanan
United States Magistrate Judge

Date: _____12/04/2017_____

_____
*Judge's signature*

City and state: Alexandria, VA

Theresa Carroll Buchanan, US Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A

*Place to be searched*

The property to be searched is 2750 Green Ash Loop #404, Woodbridge, Virginia 22192. This building is described as a four story structure designed as an apartment building. The structure has a brick exterior on the lower level and tan siding on the upper levels. All four levels are visible from the exterior. The address number "2750" is displayed horizontally in black numbers on a white background attached to the brick of the exterior on three sides of the building. All apartments in building 2750 can be accessed through two doors on the ground level. The door to apartment 404 is white in color and is located on the fourth level of the structure. The numbers "404" are posted in black on a white background to the right of the door to the apartment. This search warrant requests permission to search any safes located in the PREMISES.



## ATTACHMENT B

### *Items to be Seized*

The items to be seized are fruits, evidence, records and information relating to,

contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1)

and 846(a) (distribution and possession with intent to distribute cocaine and other controlled

substances, and conspiracy to distribute cocaine and other controlled substances) including, but

not limited to:

a. Controlled substances, packaging materials, indicia of distribution, records and
documents, receipts, notes ledgers and other papers including any computerized or
electronic records including cellular telephones, relating to the ordering, purchase or
possession of controlled substances;

b. U.S. currency and other illicit gains from the distribution of controlled substances;

c. Address and/or telephone books and papers, including computerized or electronic
address and/or telephone records reflecting names, addresses and/or telephone
numbers;

d. Books, records, receipts, bank statements, and records, money drafts, and any other
items evidencing the obtaining, secreting, transfer, concealment, storage and/or
expenditure of money or other assets including, but not limited to, controlled
substances;

e. Documents and papers evidencing ownership of proceeds from the sale of controlled
substances, storage and location of such assets and facilities to safely store and secure
such items, such as safes, to include lock boxes, and strong boxes;

f.  Photographs, in particular, photographs of controlled substances and photographs of individuals possessing controlled substances and photographs showing the association of individuals;

g.  Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys;

h.  Cellular phones, computers, and other electronic storage media or digital devices;

i.  For any electronics searched, any conversations, whether through text messages or other applications, where NILES discusses the purchase and sale of cocaine and other controlled substances;

j.  For any electronics searched, any photographs of controlled substances.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, including "smart" phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) or obtain facial recognition of individuals found at the PREMISES to the Touch ID sensor of cellular phones found at the PREMISES for the purpose of attempting to unlock the device via Touch ID or facial recognition in order to search the contents as authorized by this warrant.

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DEC 4 4 2017

IN THE MATTER OF THE SEARCH OF:

2750 Green Ash Loop #404, Woodbridge,
Virginia 22192, which is an apartment located
in a four-story apartment building

Case No. 1:17-sw-830

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Michael A. Fernald, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 4680 Joanna Court,

Woodbridge, Virginia 22193 ("PREMISES 1"), 13715 Lynn Street #16, Woodbridge, Virginia

22191 ("PREMISES 2"), 15144 Cloverdale Road, Woodbridge, Virginia 22193

("PREMISES 3"), 2750 Green Ash Loop #404, Woodbridge, Virginia 22192 ("PREMISES 4"),

10532 Cooktown Road, Spotsylvania Courthouse, Virginia 22553 ("PREMISES 5"), 1288

Bayside Avenue #11, Woodbridge, Virginia 22191 ("PREMISES 6"), 12905 Kerrydale Road,

Woodbridge, Virginia 22193 ("PREMISES 7"), 12291 Granada Way, Woodbridge, Virginia

22192 ("PREMISES 8"), 6272 Edsall Road #T10, Alexandria, Virginia 22312 ("PREMISES 9"),

and 3200 Berlin Court #204, Woodbridge, Virginia 22193 ("PREMISES 10"), hereinafter "the

PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I also submit this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the following vehicles should these

vehicles be parked in the parking lot or street outside the PREMISES, when the search warrant is executed: (1) a black 2009 Dodge Challenger bearing Virginia registration 3177UL, VIN: 2B3LJ44V39H520551 (later referred to in this affidavit as "SUBJECT VEHICLE 1"); (2) a black 2009 BMW X6 bearing Virginia registration VVM-4622, VIN: 5UXFG43599L223491 (later referred to in this affidavit as "SUBJECT VEHICLE 2"); (3) a silver 2006 Range Rover bearing Virginia registration VUN-2732, VIN: 4SALSF25456A94872 (later referred to in this affidavit as "SUBJECT VEHICLE 3"); (4) a black 2002 Ford F-150 bearing Georgia registration BZG-6399, VIN: 2FTRX18L12CA67502 (later referred to in this affidavit as "SUBJECT VEHICLE 4"); (5) a white Land Rover bearing Virginia registration VJV-3493, VIN: SALSH23447A113684 (later referred to in this affidavit as "SUBJECT VEHICLE 5"); (6) a 2007 Chevrolet work van displaying "McAllister's Carpet Cleaning Solutions" bearing Maryland registration 8CW3408, VIN: 1GCFG15XX71113119 (later referred to in this affidavit as "SUBJECT VECHILE 6"); (7) a 2004 silver Audi bearing Virginia registration OWWDI, VIN: WAUML44E74N001383 (later referred to in this affidavit as "SUBJECT VEHICLE 7"); (8) a 2006 white Chevrolet van bearing Virginia registration VZD-4267, VIN: 1GCHG35U261138184 (later referred to in this affidavit as "SUBJECT VEHICLE 8"); (9) a silver 2006 Ford Expedition bearing Virginia registration WTS-2712, VIN: 1FMPU16596LA78789 (later referred to in this affidavit as "SUBJECT VEHICLE 9"), (10) a gold Chevrolet Impala bearing Virginia registration VUT-3791, VIN: 1G11E5SA1DF306838 (later referred to in this affidavit as "SUBJECT VEHICLE 10").

3.    As further explained herein, TARVELL VANDIVER, RASHOURN NILES, CHENNOR BAH, and JERRY MCALLISTER have conspired to distribute controlled substances, including cocaine, cocaine base, and heroin (at times containing fentanyl), within the

Eastern District of Virginia and elsewhere.

4.       I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since 2014. Prior to my appointment with the ATF, I was a sworn law enforcement officer with the Commonwealth of Virginia for over eleven years. I am currently assigned to the ATF Falls Church Group II Field Office. In my capacity as a law enforcement officer, I have investigated individuals for the illegal possession and use of firearms, illegal possession and distribution of controlled substances, and for committing violent crimes. Many of these investigations involved the execution of search warrants, and led to the arrest and conviction of individuals for violations of state and federal firearms and drug trafficking laws.

5.       During my time as a law enforcement officer, I have become knowledgeable of the methods and modes of narcotics operations, and the language and patterns of drug abuse and trafficking. I have gained knowledge in the use of various investigative techniques including the use of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of Grand Jury Subpoenas, and the execution of search and arrest warrants.

6.       Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones and that communication can be made through either verbal conversation, third party communication applications, or through the use of text messages between the two communicating party's cellular telephones or other devices. It is also commonly understood and known that many people in our society communicate with their cellular telephones and other devices in both manners.

3

7.     Based on my training and experience, I also know that information gained through the obtaining of data stored in the part of the cellular telephone and other devices routinely referred to as an address book or contacts file in an individual's cellular telephone and other devices, as well as the recovery of text messages sent or received from that cellular telephone and other devices can lead to identifying accomplices, or witnesses to the crimes committed by the individual. Based on my training experience, I also know that know that individuals frequently maintain personal records and documents in an electronic format on laptop computers and/or smart phones.

8.     Based on my training and experience, I also know that distributors of controlled substances will utilize vehicles to move, store and conceal their controlled substances from law enforcement and the theft of others. These vehicles may have "traps" or other concealment methods within the vehicle or attached to the vehicle. On at least one occasion during this investigation, a conspirator believed his apartment would be a target of law enforcement and he removed his firearms and controlled substances from PREMISES 6 and put them in the trunk of his vehicle. In most if not all of the controlled purchases, conspirators would transport the controlled substances in their vehicles before distributing or manufacturing.

9.     Further, based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences and on their property additional quantities of the illicit drugs being distributed. These drugs may be concealed in locations known to the traffickers to avoid law enforcement detection. Drug traffickers also commonly maintain at their residences and on their property paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances.

10.     Based on my training and experience in executing court-authorized search

4

warrants, I also know that drug traffickers commonly maintain at their residences money ledgers and other documents, which note the price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed, or when money was possessed or transferred.

11.     The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other law enforcement officers involved in this investigation.  All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

12.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### Background on the Investigation

13.     In March 2017, the ATF and the Federal Bureau of Investigation ("FBI") began jointly investigating the Imperial Gangsta Bloods ("IGB") within the Northern Virginia area and elsewhere.  IGB members are known by law enforcement to be involved in narcotics distribution, firearms trafficking, home invasions, robberies, assaults, and homicides in Virginia, the District of Columbia, and Maryland.

14.     In February 2017, a cooperating source ("CS-1") reported to the Prince William County Police Department that TARVELL VANDIVER ("VANDIVER") was a narcotics distributor and area leader of the IGB.  CS-1 is an IGB member.  CS-1 will be referred to in the masculine gender, regardless of CS-1's true gender.  CS-1 has been convicted of two felonies, including robbery and a probation violation.  CS-1 was arrested in December of 2016, in Maryland, for possessing a stolen firearm as a convicted felon and possession of controlled

substances. CS-1 originally cooperated because he hoped to receive a lesser sentence. Based on CS-1's cooperation, his charges were dismissed. CS-1 continues to cooperate because he is being compensated. CS-1 also hopes to be relocated.

15.     CS-1 informed law enforcement that members of the IGB located in Northern Virginia and their associates were involved in the distribution of controlled substances, firearms, and have committed acts of violence, including armed home invasions, robberies, and murder. CS-1 has purchased cocaine from VANDIVER since 2014. VANDIVER was identified by CS-1 as an IGB member of high rank. VANDIVER taught CS-1 how to manufacture cocaine base. CS-1 also informed law enforcement that VANDIVER's stepfather, NILES, is VANDIVER's primary source of supply for controlled substances.

16.     In September 2008, the ATF arrested NILES for conspiracy to distribute cocaine base (also known as "crack" cocaine). NILES pleaded guilty in the Eastern District of Virginia to gun and drug charges and was sentenced. NILES was interviewed and admitted to being involved in the distribution of controlled substances since early 2005. NILES admitted he began selling marijuana in 2005 and cocaine hydrochloride and cocaine base in or around 2006. From fall 2006 to fall 2008, NILES estimated he sold on average 4.5 ounces of cocaine base per week. NILES also admitted to providing VANDIVER with 1/8 ounce quantities of cocaine base at the time.

## PROBABLE CAUSE

17.     I adopt as part of this affidavit in support of an application under Rule 41 for a warrant to search the PREMISES and SUBJECT VEHICLES and seize evidence, the attached affidavit in support of a criminal complaint and arrest warrant for VANDIVER, NILES, BAH and MCALLISTER (Attachment C). Consistent with the historical information above and CS-

6

1's report, law enforcement obtained evidence establishing that NILES is VANDIVER's source of supply for cocaine and that NILES directs VANDIVER how to manufacture cocaine base.

18.     During the course of this investigation, law enforcement coordinated approximately 31 purchases of controlled substances from, or through, VANDIVER, NILES, MCALLISTER, and/or BAH.  In each instance where a cooperating source conducted a law enforcement directed purchase of controlled substances, the cooperating source was searched for contraband before and after the transaction.  During each transaction, audio and/or video recorders were used in conjunction with law enforcement surveillance.  Further, all of the controlled substances purchased were submitted for laboratory testing.

19.     Below, I do not detail each and every purchase of controlled substances; rather, I have attached the affidavit in support of a criminal complaint that focuses on the significant purchases.  However, the below table does detail each law enforcement directed purchase in this investigation, including controlled purchases for all controlled substances from or through VANDIVER, NILES, BAH and/or MCALLISTER.

| # | Date | Lab Test | Amount | Purchased From |
|---|------|----------|--------|----------------|
| 1 | 03/02/2017 | Cocaine HCL | 27.71 grams | VANDIVER |
| 2 | 03/11/2017 | Cocaine HCL | 27.92 grams | VANDIVER |
| 3 | 03/23/2017 | Cocaine HCL | 55.75 grams | VANDIVER |
| 4 | 03/28/2017 | Fentanyl | 3.55 grams | HARDWICK |
| 5 | 03/30/2017 | Cocaine HCL | 123.12 grams | VANDIVER |
| 6 | 03/30/2017 | Fentanyl/Heroin | 3.44 grams | HARDWICK |
| 7 | 04/06/2017 | Cocaine Base | 108.82 grams | VANDIVER / NILES |
| 8 | 04/06/2017 | Cocaine HCL | 27.92 grams | VANDIVER / NILES |

| # | Date | Lab Test | Amount | Purchased From |
|---|------|----------|--------|----------------|
| 9 | 04/25/2017 | Fentanyl/Heroin | 75.17 grams | VANDIVER / NILES / MCALLISTER |
| 10 | 05/02/2017 | Heroin | 86.40 grams | MCALLISTER |
| 11 | 05/04/2017 | Cocaine Base | 185.10 grams | VANDIVER |
| 12 | 05/09/2017 | Cocaine HCL | 27.98 grams | VANDIVER |
| 13 | 05/10/2017 | Cocaine Base | 14.58 grams | PETERSON |
| 14 | 05/17/2017 | Cocaine Base | 25.75 grams | PETERSON |
| 15 | 05/18/2017 | Marijuana | 41.08 grams | VANDIVER |
| 16 | 05/24/2017 | Cocaine Base | 41.08 grams | PETERSON |
| 17 | 05/25/2017 | Heroin | 54.31 grams | VANDIVER / KETTER |
| 18 | 06/01/2017 | Heroin | 49.49 grams | KETTER |
| 19 | 06/02/2017 | Cocaine Base | 41.97 grams | PETERSON |
| 20 | 06/08/2017 | Cocaine Base | 32.73 grams | PETERSON |
| 21 | 06/15/2017 | Heroin | 46.61 grams | KETTER |
| 22 | 06/16/2017 | Cocaine Base | 55.35 grams | PETERSON |
| 23 | 06/22/2017 | Cocaine Base (Lab Pending) | 66 grams est. | VANDIVER / PETERSON |
| 24 | 07/06/2017 | Cocaine Base (Lab Pending) | 29 grams est. | PETERSON |
| 25 | 07/26/2017 | Cocaine Base | 27.40 grams | VANDIVER / PETERSON |
| 26 | 07/27/2017 | Marijuana | 1,266.9 grams | VANDIVER / CAREW |
| 27 | 08/11/2017 | Lab Pending | 58 grams est. | VANDIVER / EDLER |
| 28 | 08/17/2017 | Lab Pending | 55 grams est. | VANDIVER / EDLER |
| 29 | 08/31/2017 | Cocaine Base | 369.89 grams | VANDIVER / NILES |

8

| # | Date | Lab Test | Amount | Purchased From |
|----|------------|------------------------------|------------------|--------------------------|
| 30 | 10/30/2017 | Cocaine (Lab Pending) | 505 grams est. | VANDIVER / NILES / BAH |
| 31 | 11/09/2017 | Heroin (Lab Pending) | 43 grams est. | KETTER |

## INFORMATION ON THE INVOVLED PREMISES

20.     During the course of this investigation, law enforcement obtained a search warrant authorizing the disclosure of location-based services for NILES' known cellular phone. Between August 12, 2017 and October 24, 2017, law enforcement received approximately 10, 286 precision locations for NILES' handset. From that total, 2,758 of the locations were accurate to 100 meters or less. Based on an analysis of the accurate precision locations, the NILES' known cellular phone frequented the following locations:  PREMISES 1, PREMISES 2, PREMISES 3, PREMISES 4, PREMISES 5, and PREMISES 7.

A.     **PREMISES 1 – 4680 JOANNA COURT WOODBRIDGE, VIRGINIA**

21.     According to law enforcement databases, several of NILES' family members reside at PREMISE 1. PREMISES 1 is listed as a shared address for NILES from January 2003 to October 2017.

22.     On August 30, 2017, law enforcement conducted surveillance on NILES. A BMW X6 bearing Virginia registration VVM-4622 ("SUBJECT VEHICLE 2") registered to an individual ("Individual 1"), who is known to reside at PREMISES 4, was located at PREMISES 1. Later on this same date, NILES was observed driving a silver Range Rover bearing Virginia registration VUN-2732 ("SUBJECT VEHICLE 3"), which was registered to a relative of NILES known to reside at PREMISES 1.

9

23.     On September 18, 2017, NILES was observed in a black 2002 Ford F-150 bearing Georgia registration BZG-6399 ("SUBJECT VEHICLE 4") at PREMISES 1.  SUBJECT VEHICLE 4 was also observed being operated by NILES at PREMISES 2, PREMISES 3, PREMISES 5, and PREMISES 7.

24.     On October 10, 2017, NILES was followed from PREMISES 4 to PREMISES 1 in a rental vehicle.  NILES walked out of PREMISES 1 carrying a plastic bag and was followed to a store on Cardinal Drive in his rental vehicle.  At the store, an unidentified male was observed exiting NILES' rental vehicle with the plastic bag and entering the front passenger seat of a Hyundai sedan, which then departed the area.  A short time later, NILES drove away in the rental vehicle and was followed back to PREMISES 1.

25.     On October 15, 2017, NILES was followed driving SUBJECT VEHICLE 5 (registered to PREMISES 7) from PREMISES 3 to PREMISES 5.  After several other stops, NILES was followed to PREMISES 1 and was observed entering PREMISES 1.  Approximately four minutes after his arrival at PREMISES 1, law enforcement followed NILES to PREMISES 4.

26.     On November 15, 2017, law enforcement conducted surveillance on PREMISES 1. NILES was observed in SUBJECT VEHICLE 3 parking in a spot designated for PREMISES 1. NILES was observed walking up the steps to the entrance of PREMISES 1; however, law enforcement did not observe him enter the residence.  A short time later, SUBJECT VEHICLE 2 also arrived at PREMISES 1.  NILES was later observed smoking a cigarette in the front yard of PREMISES 1.  NILES then entered PREMISES 1.

B.    **PREMISES 2 – 13715 LYNN STREET #16 WOODBRIDGE, VIRGINIA**

27.     When law enforcement requested assistance from the onsite management team at

10

PREMISES 2, the management requested specific details about the investigation, including the involved apartments and persons. As a result, I and other agents do not feel comfortable subpoenaing the management company for the leasing information for PREMISES 2. Without standing in the lobby area of the building entrance, which is where the multiple interior apartment entrances are located, it is difficult to observe individuals entering and exiting the PREMISES. Law enforcement requested permission from the management company to place a camera in the public access point to the building; however, the management company denied this request. Law enforcement were able to conduct discreet surveillance inside the building and did observe NILES exit and enter PREMISES 2 using a key. Law enforcement has never seen another individual enter or exit PREMISES 2 or accompany NILES to PREMISES 2. However, it was not possible for law enforcement to observe the PREMISES at all times. On one occasion, law enforcement observed a co-conspirator from PREMISES 7 drive to the parking lot of PREMISES 2; however, the co-conspirator was not observed entering PREMISES 2 with NILES.

28.      In addition, the United States Postal Inspectors Service contacted the mail carriers that service PREMISES 2. The mail carriers stated that they believe a female lives at the apartment. The female has not been checking her mail and the carriers have left notices asking her to empty her mailbox.

29.      On August 31, 2017, CS-1 ordered a $15,000 quantity of cocaine base through VANDIVER. VANDIVER ordered 10 ounces of cocaine from NILES. On this date, law enforcement followed NILES who was operating SUBJECT VEHICLE 3 and observed him in the area of PREMISES 2. NILES departed the area of PREMISES 2 and was followed from the complex in SUBJECT VEHICLE 3 directly to the location where he distributed 10 ounces of

cocaine to VANDIVER.  NILES was then followed to PREMISES 3.

30.     On September 18, 2017, law enforcement conducted surveillance on NILES.
NILES was observed exiting PREMISES 2 and entering the driver's seat of SUBJECT
VEHICLE 4.  SUBJECT VEHICLE 4 is the same vehicle NILES was observed driving from
PREMISES 3 to PREMISES 5 on August 31, 2017.  SUBJECT VEHICLE 4 was also observed
at PREMISES 1 and PREMISES 7 on this date.

31.     On September 19, 2017, law enforcement followed NILES to PREMISES 2,
while he was driving SUBJECT VEHICLE 4.  When NILES parked, law enforcement followed
NILES on foot.  Law enforcement observed NILES remove his keys and open the door to
apartment #16 (PREMISES 2) and then enter.  After staying at the apartment for approximately
one hour, NILES left the apartment and drove to PREMISES 1 in SUBJECT VEHICLE 4.
NILES remained at PREMISES 1 for a few hours.  NILES then drove to PREMISES 3.

32.     On October 16, 2017, NILES was followed to PREMISES 2.  Law enforcement
observed NILES exit apartment #16 and use a key to lock the door when he left.  NILES was
observed carrying a white trash bag and then entering SUBJECT VEHICLE 3.  Law enforcement
then followed NILES to PREMISES 6.

33.     On November 14, 2017, law enforcement conducted surveillance on PREMISES
2.  NILES was observed leaving PREMISES 3 driving the SUBJECT VEHICLE 2.
Approximately 14 minutes later, NILES arrived at PREMISES 2 in SUBJECT VEHICLE 2.
NILES entered the building that contains PREMISES 2 and departed approximately 15 seconds
later while on the phone.  NILES returned to PREMISES 2 a few minutes later.

34.     On November 28, 2017, CS-1 ordered five ounces of heroin through VANDIVER
from NILES.  Prior to the transaction, law enforcement observed NILES depart PREMISES 3,

12

travel to PREMISES 4 and then travel to PREMISES 2.  After departing PREMISES 2, NILES

was followed to an apartment complex off Summerland Drive, Woodbridge, Virginia.  There,

NILES distributed approximately 150 grams of suspected heroin to VANDIVER and CS-1.

After the transaction, NILES was followed to PREMISES 4.  The suspected heroin was

submitted to the DEA Mid-Atlantic laboratory for analysis.

C.   **PREMISES 3 – 15144 CLOVERDALE ROAD WOODBRIDGE, VIRGINIA**

35.   A law enforcement database check on PREMISES 3 lists VANDIVER's mother

and NILES' wife as the resident from December 2016 to October 2017.  Law enforcement has

observed both NILES and VANDIVER frequent this address before, during, and after drug and

firearm transactions.

36.   .VANDIVER's mother and NILES' wife resides in PREMISES 3.  Law

enforcement has had the residence under surveillance throughout this investigation and both

parties frequent the residence on a regular basis.

37.   On July 13, 2017, CS-1 was socializing with VANDIVER.  VANDIVER

informed him that MARK KETTER was at a birthday party for VANDIVER's brother.

VANDIVER's brother told KETTER he was lucky he did not kill him because he found out

acquaintances of KETTER were planning to commit a home invasion/robbery of PREMISES 3.

VANDIVER informed CS-1 that KETTER was aware of the planned home invasion and did not

notify him.

38.   On July 25, 2017, law enforcement followed VANDIVER and CS-1 to

PREMISES 3 prior to VANDIVER manufacturing cocaine base at an apartment on Lost Canyon

Court, Woodbridge.  After leaving the apartment to distribute the manufactured cocaine base to

BRANDON EDLER ("EDLER"), law enforcement followed VANDIVER back to PREMISES

13

3.

39.     On July 27, 2017, VANDIVER sold two firearms to CS-1 while inside PREMISES 3.  While at PREMISES 3, VANDIVER retrieved a quantity of cocaine that was inside a white container located next to a couch.  VANDIVER and CS-1 later traveled to Maryland to purchase a quantity of marijuana and returned to PREMISES 3 after the transaction.

40.     On August 8, 2017, CS-1 met VANDIVER at PREMISES 3.  They left PREMISES 3 and went to purchase a quantity of marijuana from a co-conspirator.

41.     On August 31, 2017, VANDIVER ordered 10 ounces of cocaine from NILES. On this date, law enforcement surveillance followed NILES and observed NILES in the area of PREMISES 2.  NILES departed the area of PREMISES 2 in SUBJECT VEHICLE 3 and was followed to the meeting location, where NILES distributed 10 ounces of cocaine to VANDIVER. After the transaction, NILES was followed by law enforcement to PREMISES 3.

42.     On the same date, VANDIVER manufactured the 10 ounces of cocaine purchased from NILES into approximately 370 grams of cocaine base.  VANDIVER took CS-1 to the screened in porch area attached to the rear of PREMISES 3.  There, a scale that could measure the weight of the cocaine base was present.  VANDIVER had a scale at the apartment where he manufactured the cocaine base, but told CS-1 he needed the larger scale located at PREMISES 3. CS-1 was able to record the cocaine base on the digital scale at PREMISES 3.

43.     On September 19, 2017, law enforcement observed NILES leaving PREMISES 3 and entering the F-150.  Law enforcement followed NILES to the rear of Potomac Plaza, where NILES was observed meeting with two Hispanic males.  From Potomac Plaza, NILES was followed to PREMISES 2.

44.     On October 2, 2017, law enforcement observed NILES driving a rental vehicle.

14

NILES was followed to PREMISES 3, where he parked the vehicle and entered the residence.

45.     On October 3, 2017, law enforcement conducted surveillance on NILES.  NILES was observed leaving PREMISES 3 and driving in the rental vehicle to another co-conspirator's residence in Riverdale, Maryland.  After meeting with the co-conspirator, NILES was followed to PREMISES 2.

46.     On October 15, 2017, law enforcement observed NILES exit PREMISES 3 and leave in SUBJECT VEHICLE 5, which is registered to Co-Conspirator 1 at PREMISES 7.  Law enforcement followed NILES to PREMISES 5.

47.     On October 16, 2017, law enforcement located NILES and SUBJECT VEHICLE 5 at PREMISES 3.  NILES departed PREMISES 3 and drove away in SUBJECT VEHICLE 5.  Surveillance lost NILES for a short time, but law enforcement located SUBJECT VEHICLE 5 shortly thereafter at PREMISES 2.

48.     On November 7, 2017, law enforcement observed NILES exit the front door of PREMISES 3 and depart in SUBJECT VEHICLE 3.

D.     **PREMISES 4 – 2750 GREEN ASH LOOP #404 WOODBRIDGE, VIRGINIA**

49.     A law enforcement database check revealed Individual 1 is a resident of PREMISES 4.  NILES has been observed operating the SUBJECT VEHICLE 2 since in March 2017.  The SUBJECT VEHICLE 2 is registered to Individual 1.

50.     On September 5, 2017, law enforcement observed the registered owner of the SUBJECT VEHICLE 2 in the parking lot of PREMISES 4.

51.     On October 9, 2017, NILES' phone location data revealed he was in the area of PREMISES 4.  Upon law enforcement's arrival in the area, they observed MCALLISTER's

15

white work van, SUBJECT VEHICLE 6. Further, a rental vehicle known to be operated by

NILES was also located in the parking lot of PREMISES 4. Law enforcement located a silver

Honda sedan also registered to Individual 1 parked in the same area of the parking lot. NILES

was observed leaving PREMISES 4 and entering the rental vehicle.

52. On October 10, 2017, law enforcement conducted surveillance on PREMISES 4.

A female believed to be the registered owner of the SUBJECT VEHICLE 2 was observed exiting

PREMISES 4. At approximately 8:47 p.m., law enforcement recorded NILES exiting

PREMISES 4 and confirmed the apartment number to be #404. NILES was observed using a

key to secure the residence. NILES was followed in his rental vehicle from PREMISES 4 to a

CVS on Dale Boulevard and then to PREMISES 1.

53. On October 15, 2017, NILES was observed entering SUBJECT VEHICLE 5 at

PREMISES 3. NILES was later observed in SUBJECT VEHICLE 5 at PREMISES 5. Law

enforcement conducted surveillance on NILES in SUBJECT VEHICLE 5 from PREMISES 5 to

PREMISES 1, and then to PREMISES 4. NILES entered PREMISES 4 and was later observed

exiting PREMISES 4 with Individual 1. NILES and Individual 1 entered a Honda sedan, which

is registered to Individual 1. NILES and the registered owner of the Honda were followed to

PREMISES 3. Three minutes after their arrival, they departed PREMISES 3, and drove back to

PREMISES 4. NILES then departed the area of PREMISES 4 in SUBJECT VEHICLE 5.

54. On October 30, 2017, CS-1 ordered a half of a kilogram of cocaine for $19,950

through VANDIVER from NILES. NILES was reportedly in Atlanta, Georgia. CHENNOR

BAH ("BAH") delivered the cocaine to VANDIVER at PREMISES 6. BAH was operating

SUBJECT VEHICLE 7 and resides at PREMISES 8. SUBJECT VEHICLE 7 is also registered

to PREMISES 8. BAH was followed from PREMISES 6 to PREMISES 4, where he was

16

observed entering with the plastic bag VANDIVER provided to him. BAH left PREMISES 4 a short time later and no longer had the plastic bag. Law enforcement believed the money used to buy the cocaine was in the plastic bag.

55.     On November 6, 2017, law enforcement conducted surveillance on PREMISES 4. NILES was observed leaving PREMISES 4 and departing the area in SUBJECT VEHICLE 3. SUBJECT VEHICLE 3 was seen approximately two hours later at PREMISES 3.

56.     On November 7, 2017, law enforcement observed NILES park SUBJECT VEHICLE 3 at PREMISES 4. On this date, NILES approached a law enforcement member in a surveillance (undercover) capacity and had a conversation with the member. NILES informed the member that he had a sister that lived in the building and identified himself as "Tony."

57.     On November 12, 2017, law enforcement observed the white Chevrolet work van, SUBJECT VEHICLE 8, which law enforcement previously observed NILES operate, and SUBJECT VEHICLE 2 parked in the parking lot of PREMISES 4.

E.     **PREMISES 5 – 10532 COOKTOWN ROAD SPOTYSLVANIA, VIRGINIA**

58.     The Spotsylvania County, Virginia property records show a deceased female is the owner of the property. It is unknown who currently owns the residence, however, a middle-aged female that drives a Volvo sedan has been regularly observed at the residence. The female parks the Volvo in the front PREMISES 5 and has been observed entering the front entrance, which would be most convenient to her parking space. Other unidentified males in their twenties have been observed at the residence as well.

59.     On August 31, 2017, VANDIVER ordered 10 ounces of cocaine from NILES. Law enforcement surveillance followed NILES on this date and observed him in the area of PREMISES 2. NILES departed the area of PREMISES 2 and was followed to the meeting

17

location in SUBJECT VEHICLE 3, where NILES distributed 10 ounces of cocaine to

VANDIVER. After the transaction, NILES was followed by law enforcement to PREMISES 3.

At PREMISES 3, NILES parked SUBJECT VEHICLE 3 and then entered SUBJECT VEHICLE

4. NILES was then followed to PREMISES 5 in SUBJECT VEHICLE 4, where law

enforcement observed NILES in the backyard and wood line behind PREMISES 5. Air

surveillance units reported NILES and an unidentified individual appeared to be burying

something in the backyard.

     60.    On October 2, 2017, law enforcement established real-time video surveillance on

PREMISES 5. The video was not viewed in real-time at all times and a thorough review of the

video surveillance was conducted more recently. The fixed position of the camera prevented law

enforcement from capturing a view of the rear wall (rear entrance) of PREMISES 5. From

October 2, 2017 until November 30, 2017, vehicle and foot traffic have regularly been observed

coming and going from the rear of the property. The video surveillance corroborated prior law

enforcement observations that vehicles associated with NILES and/or co-conspirators, or being

operated by NILES, would drive past PREMISES 5 and park near the wood line. NILES and/or

co-conspirators would then walk into the wood line behind PREMISES 5. On numerous

occasions video surveillance captured these individuals walking from the wood line behind the

residence in the direction of the rear wall. The individuals then disappeared out of the camera's

view. A short time later, the individuals reappear in the same area and walk either back into the

wood line or return to their vehicles and depart.

     61.    On September 20, 2017, law enforcement conducted surveillance at PREMISES

5. On this date, law enforcement was checking location data provided by NILES' phone carrier.

Law enforcement observed NILES leaving PREMISES 3 and driving away in SUBJECT

18

VEHICLE 9. Based on location data for NILES' known cellular phone, NILES traveled to the North Carolina/Virginia border before promptly heading back north. Based on my training and experience, I know that the North Carolina/Virginia border is an area where individuals can obtain distribution quantities of controlled substances. I also know that this quick turnaround indicates that NILES may have obtained a resupply of controlled substances. At approximately 2:27 p.m., law enforcement observed SUBJECT VEHICLE 9 arrive back at PREMISES 5, drive past the residence, and park in the wooded area to the rear of the property. SUBJECT VEHICLE 9 departed and was followed onto I-95 north and was later observed by law enforcement parked at PREMISES 3.

62.     On September 27, 2017, law enforcement again conducted surveillance on NILES and PREMISES 5. On this date, law enforcement observed SUBJECT VEHICLE 4 and SUBJECT VEHICLE 9 parked behind the residence near the wood line of PREMISES 5.

63.     On October 7, 2017, law enforcement observed (via a surveillance camera, which was reviewed on a later date) an individual consistent in build and appearance with Co-Conspirator 1 park a "Moving with Pride" truck in the driveway besides the residence (not at the wood line) at PREMISES 5. Co-Conspirator 1 has been previously seen at PREMISES 7. There were also two more unidentified individuals in the truck. The individuals walked to the wood line behind PREMISES 5. The individuals were then observed walking towards the rear of the premises where they went out of sight. This is where law enforcement believes individuals are accessing the home from the wood line. A review of NILES cellular phone location shows his device in the area of PREMISES 5 at the same time as the moving truck. Based on this, I believe NILES was one of the occupants of the moving truck. During the course of this investigation law enforcement surveillance also observed Co-Conspirator 1 and the moving truck parked at

19

PREMISES 7.

64.     On October 17, 2017, law enforcement conducted air surveillance over PREMISES 5. Law enforcement reported there were structures in an unknown state of construction concealed within the wood line.

65.     On November 12, 2017, a subject that appeared to be NILES was observed arriving at PREMISES 5 in SUBJECT VEHICLE 8 and pulling into the wood line behind PREMISES 5. The subject believed to be NILES and a heavier set unidentified African American male were observed retrieving boxes from the rear of SUBJECT VEHICLE 8 and walking back towards the wood line. The subject believed to be NILES was observed walking to the rear of the residence, before returning to the wood line. The two individuals were observed carrying a weed eater and another power tool from the wood line to SUBJECT VEHICLE 8. SUBJECT VEHICLE 8 was previously observed in the control of a subject believed to be NILES on other days at PREMISES 1, 2, 4, and 8. A review of camera footage from different PREMISES does appear to corroborate that the individual is NILES.

66.     On November 13, 2017, SUBJECT VEHICLE 9 was observed in the tree line behind PREMISES 5. Two males were observed moving furniture in the back yard. The individuals then returned to the SUBJECT VEHICLE 9 removing a small package from the vehicle and took it in the direction of PREMISES 5. SUBJECT VEHICLE 9 departed PREMISES 5 and then returned with a trailer and the males began to load lawn debris onto it. SUBJECT VEHICLE 9 departed the area leaving the trailer behind.

67.     Law enforcement has observed that when these vehicles pull down the side of the driveway next to PREMISES 5, the most convenient entrance into PREMISES 5 would be the rear entrance. In the incidents captured on law enforcement video surveillance, individuals

regularly park their vehicles, walk directly to the suspect area in the wood line, and then

approach the residence through the rear. The individuals then disappear out of sight for a short

period before reappearing. Based on this activity, I believe that NILES and others are using a

rear entrance to enter the home.

68.     The area of the wood line NILES has been observed in is directly behind

PREMISES 5. I reviewed the Spotsylvania County land records and based on the review, I

believe the wood line belongs to PREMISES 5. In addition, while other residences are adjacent

to the wood line, NILES has repeatedly been seen entering the wood line by parking within the

curtilage of PREMISES 5 and then walking across the property associated with PREMISES 5.

69.     Based on NILES' apparent digging in the wood line, this search warrant seeks

permission to dig up areas of the backyard. I seek this permission because I submit there is

probable cause to support that NILES may be burying controlled substances or drug proceeds in

the backyard of PREMISES 5.

F.      **PREMISES 6 – 1288 BAYSIDE AVENUE #11 WOODBRIDGE, VIRGINIA**

70.     In September 2017, CS-1 reported VANDIVER moved to PREMISES 6. On

September 22, 2017, law enforcement conducted surveillance and observed VANDIVER's

SUBJECT VEHICLE 1 in the parking lot. Law enforcement observed VANDIVER exit

PREMISES 6 and leave in SUBJECT VEHICLE 1.

71.     On September 8, 2017, CS-1 reported he was socializing with VANDIVER at

ANGLIN's apartment. While there, CS-1 was able to photograph VANDIVER measuring out a

"four-deuce" (4.5 ounces) of cocaine on the kitchen counter. CS-1 also took a photograph of a

firearm and a firearm box displaying "Smith & Wesson M&P" on it. The firearm and firearm

box were later observed in PREMISES 6.

21

72.     On September 29, 2017, at law enforcement direction, CS-1 was socializing with VANDIVER at PREMISES 6.  While there, VANDIVER informed him that NILES would only sell four and one half ounces of cocaine minimum from now on.

73.     On September 30, 2017, CS-1 observed VANDIVER sell one eighth of an ounce of cocaine to EDLER, while inside PREMISES 6.

74.     On October 1, 2017, CS-1 observed VANDIVER sell one ounce of cocaine to an unidentified individual at PREMISES 6.  CS-1 was able to capture images of VANDIVER preparing the ounce of cocaine for sale.

75.     CS-1 reported VANDIVER is using PREMISES 6 as his primary residence and drug distribution location.

76.     On October 16, 2017, NILES was followed by law enforcement from PREMISES 3 to PREMISES 2 then to PREMISES 6.  VANDIVER was observed exiting PREMISES 6 and entering SUBJECT VEHICLE 5.  A minute later, VANDIVER exited SUBJECT VEHICLE 5 and returned to PREMISES 6.

77.     On October 17, 2017, at law enforcement direction, CS-1 socialized with VANDIVER at PREMISES 6.  Law enforcement observed another individual enter PREMISES 6, which CS-1 also reported.  At approximately 1:11 p.m., law enforcement observed VANDIVER exit PREMISES 6, walk to SUBJECT VEHICLE 1, and place two bags inside the trunk of SUBJECT VEHICLE 1 before returning to PREMISES 6.  CS-1 reported a maintenance man had knocked on the door of PREMISES 6, which caused VANDIVER to be weary of a law enforcement raid.  VANDIVER took his controlled substances and placed them in one bag and his firearms in a second bag, and placed them in the trunk of SUBJECT VEHICLE 1.

78.     On October 30, 2017, at law enforcement direction, CS-1 ordered half a kilogram

22

of cocaine for $19,950 through VANDIVER while at PREMISES 6. VANDIVER called NILES who coordinated the delivery of the cocaine. VANDIVER informed CS-1 that "Certain niggas don't have certain shit...his man Mook might have half a joint." Mook is an alias for Co-Conspirator 1, who resides at PREMISES 7. An individual, who was later identified as BAH, delivered the cocaine. VANDIVER exited PREMISES 6 with a bag, met with BAH outside of PREMISES 6 in the parking lot, and then returned to PREMISES 6 with another bag. BAH was driving SUBJECT VEHICLE 7. VANDIVER brought the cocaine into PREMISES 6 where he weighed the cocaine. VANDIVER then used a heat sealer that was on top of the microwave to reseal the package. After the transaction, law enforcement followed BAH to PREMISES 4, where he was observed exiting SUBJECT VEHICLE 7 with the same bag VANDIVER had in his possession at PREMISES 6. BAH entered PREMISES 4 and then returned a short time later without the bag.

79.    On November 13, 2017, at law enforcement direction, CS-1 met with VANDIVER at PREMISES 6. VANDIVER and CS-1 drove to a residence on Pine Bluff Drive to make a marijuana sale. At approximately 7:05 p.m., law enforcement observed CS-1 and VANDIVER exit PREMISES 6 and leave in SUBJECT VEHICLE 1. SUBJECT VEHICLE 1 was followed to Point Pleasant Lane, where CS-1 reported VANDIVER delivered one half pound of marijuana to a co-conspirator. CS-1 and VANDIVER returned to PREMISES 6 after making the sale of marijuana.

### G.    **PREMISES 7 – 12905 KERRYDALE ROAD, WOODBRIDGE, VIRGINIA**

80.    NILES was first observed visiting PREMISES 7 on September 18, 2017, while law enforcement conducted surveillance on him driving SUBJECT VEHICLE 4. NILES was

23

followed from PREMISES 2 to PREMISES 7. While at PREMISES 7, NILES met with two then unidentified males. One of the males was observed entering a 1999 silver BMW sedan registered to one of NILES' relatives. In the evening hours on this date, SUBJECT VEHICLE 4 was located by law enforcement at PREMISES 1 along with SUBJECT VEHICLE 3.

81.     On October 18, 2017, NILES had a detailed conversation with VANDIVER about a batch of cocaine that was not coming out right when customers were manufacturing cocaine base. NILES informed VANDIVER that he was planning on taking his partner to the MGM Casino for his birthday. NILES has been observed driving two different vehicles registered to Co-Conspirator 1 of PREMISES 7. Co-Conspirator 1's birthday is in fact on October 18. CS-1 would later report to law enforcement that NILES was referring to his business partner for purchasing and distributing drugs during the above conversation (believed to be Co-Conspirator 1).

82.     On October 22, 2017, law enforcement observed NILES and Co-Conspirator 2 enter PREMISES 7. Co-Conspirator 2 is a known trafficker of large quantities of cocaine. NILES used a key to unlock the front door of the residence. After NILES entered the residence, Co-Conspirator 1 met Co-Conspirator 2 outside the residence.

83.     On October 23, 2017, law enforcement conducted surveillance at PREMISES 7. Co-Conspirator 1 was observed coming and going from PREMISES 7 and operating several vehicles. One of the vehicles was SUBJECT VEHICLE 5, which law enforcement previously observed NILES operate on several occasions. Co-Conspirator 1 was observed meeting with an unidentified subject in the driveway of the residence. The unidentified subject walked away from PREMISES 7 clenching something under his left arm and Co-Conspirator 1 returned to PREMISES 7. Based on the law enforcement officer's experience, the actions he observed were

24

consistent with a drug transaction.

84.     On October 25, 2017, law enforcement conducted surveillance at PREMISES 7. At approximately 1:32 p.m., NILES was observed exiting PREMISES 7 towards SUBJECT VEHICLE 8. Co-Conspirator 1 was observed exiting the residence shortly thereafter. Co-Conspirator 1 was observed opening the trunk of a black Mercedes. NILES was observed carrying a blue plastic tote from the residence and then packing the tote in in the back of the SUBJECT VEHICLE 8. NILES and Co-Conspirator 1 were then observed placing what appeared to be power tools in SUBJECT VEHICLE 8. NILES in SUBJECT VEHICLE 8 was followed to PREMISES 2. Law enforcement would later observe Co-Conspirator 1 leave the area of PREMISES 2 in SUBJECT VEHICLE 5 and NILES left in SUBJECT VEHICLE 8. NILES was then observed in the area of PREMISES 4. Law enforcement observed NILES depart PREMISES 4 and drive SUBJECT VEHICLE 8 to PREMISES 1.

85.     On November 13, 2017, law enforcement pulled the trash from PREMISES 7. The trashcan was sitting on the public sidewalk next to the curb with the lid open. Documents with Co-Conspirator 1's name were recovered.

H.      **PREMISES 8 – 12291 GRANADA WAY, WOODBRIDGE, VIRGINIA**

86.     Upon identifying BAH, after the October 30, 2017 half-kilogram cocaine transaction, law enforcement queried databases. The Virginia Department of Motor Vehicles revealed BAH's home address to be PREMISES 8. BAH's Virginia Employment Commission report shows him not earning any income since the fourth quarter of 2015. BAH has an associate, who owns a Range Rover. This vehicle is also associated with Nasiru Carew.

87.     On November 15, 2017, law enforcement conducted surveillance at PREMISES 8. SUBJECT VEHICLE 7 was parked at PREMISES 8. BAH was observed leaving in

SUBJECT VEHICLE 7 and then returning to PREMISES 8 in SUBJECT VEHICLE 7. BAH used a key to enter the door to PREMISES 8 and was observed exiting to walk a dog.

I.       **PREMISES 9 – 6272 EDSALL ROAD #T10, ALEXANDRIA, VIRGINIA**

88.     On May 2, 2017, law enforcement met MCALLISTER at a bar located on South Pickett Road, Alexandria, Virginia to purchase heroin. During the transaction, MCALLISTER stated that he is always in the Alexandria, Virginia area despite living at location in Maryland. The bar is located approximately one mile from PREMISES 9.

89.     On November 8, 2017, law enforcement was conducting surveillance on MCALLISTER, who was operating SUBJECT VEHICLE 6. MCALLISTER was followed from his residence in Laurel, Maryland, to Baltimore, Maryland. Based on my training and experience, I know Baltimore is a source city for heroin. MCALLISTER was then followed to several locations in Maryland and Virginia, where he conducted activities consistent with drug transactions. At approximately 3:30 p.m., MCALLISTER was followed to the area of PREMISES 9. At approximately 3:42 p.m., MCALLISTER exited PREMISES 9's building and departed in his SUBJECT VEHICLE 6.

90.     On November 16, 2017, law enforcement conducted surveillance at PREMISES 9. Law enforcement observed two unidentified females ("UF 1") and ("UF 2") entering and exiting the premises. UF 1 was observed entering the apartment carrying a backpack. A short time later, UF 2 was observed exiting the apartment through the patio door. In the afternoon, MCALLISTER was observed arriving at PREMISES 9 in SUBJECT VEHICLE 6. MCALLISTER was also observed exiting the patio door and departing PREMISES 9.

91.     On November 17, 2017, law enforcement conducted surveillance at PREMISES 9. UF 1 was observed entering and exiting the patio door. MCALLISTER was observed

26

arriving in SUBJECT VEHICLE 6 at approximately 4:36 p.m. and then entering PREMISES 9.
Law enforcement observed the interior of the apartment through the patio window, which was
open to public view at the time. MCALLISTER was observed counting U.S. currency inside
PREMISES 9. MCALLISTER placed large bundles of U.S. currency in his pants pockets before
an unidentified male in the apartment covered the window with a sheet. MCALLISTER
departed PREMISES 9 approximately one hour later in SUBJECT VEHICLE 6.

92.     On the same date, law enforcement followed MCALLISTER, who was driving
SUBJECT VEHICLE 6, to the Freedom High School located in Woodbridge. MCALLISTER
was observed meeting with Co-Conspirator 3, who is known to spend time at a suspected stash
house located at PREMISES 10. After taking part in what appeared to be a drug transaction,
MCALLISTER entered the football stadium and Co-Conspirator 3 was followed to PREMISES
10. Co-Conspirator 3 was followed from PREMISES 10 to a residence located on Evansdale,
where he remained a short time before returning to PREMISES 10. MCALLISTER remained at
Freedom High School until a football game ended. MCALLISTER was then followed in
SUBJECT VEHICLE 6 to Ashdale Plaza. There, MCALLISTER was observed engaging in a
suspected drug transaction. MCALLISTER then departed the area in SUBJECT VEHICLE 6.

93.     Based on my training and experience, I know it is common for drug traffickers to
maintain controlled substances, illicit contraband, and proceeds from their illegal activities at
multiple residences to prevent law enforcement and/or robbers from seizing the contraband.

J.       **PREMISES 10 – 3200 BERLIN COURT #204, WOODBRIDGE, VIRGINIA**

94.     During the August 31, 2017 controlled purchase, where VANDIVER
manufactured the 10 ounces of cocaine purchased from NILES into approximately 370 grams of
cocaine base, VANDIVER traveled to the area of PREMISES 10 in order to distribute one (1)

27

ounce of cocaine. While in the area of PREMISES 10, VANDIVER stated, "Jack's in there." "Jack" is known to law enforcement as JAVELLE JOHNSON, who has distributed controlled substances during this investigation. VANDIVER further discussed the process of how the individuals inside the apartment manufactured cocaine base in PREMISES 10. Further, law enforcement observed JOHNSON leaving the area of PREMISES 10 during this controlled purchase.

95.     On September 14, 2017, during an interview, a cooperating defendant ("CD-1") stated that JOHNSON operated a drug house in the area of PREMISES 10. CD-1 stated that JOHNSON's "scrap" (gang subordinate), who operates PREMISES 10, is know to use the name "Reggae Tone." CD-1 further stated that he had previously distributed quantities of cocaine to "Reggae Tone" in the area of PREMISES 10. CD-1 stated the cocaine provided to "Reggae Tone" was manufactured into cocaine base. CD-1 has multiple felony convictions, including for crimes of dishonesty. CD-1 has pleaded guilty to distributing heroin and to using and carrying a firearm during and in relation to his distributing heroin. CD-1 is cooperating because he hopes to reduce his sentence.

96.     On October 1, 2017, CS-1 was socializing with VANDIVER at PREMISES 6. CS-1 stated that he observed VANDIVER sell approximately one (1) ounce of cocaine to an unknown individual that CS-1 had previously observed in the area of PREMISES 10. CS-1 stated he believed this unknown individual sold drugs including cocaine base from PREMISES 10.

97.     On October 5, 2017, law enforcement observed VANDIVER operating SUBJECT VEHICLE 1 in the area of PREMISES 10. Law enforcement observed VANDIVER park his vehicle in front and then observed a male, who was later identified as Co-Conspirator 4, receive

28

a small white package consistent with cocaine from VANDIVER. Co-Conspirator 4 then entered

the front entrance to PREMISES 10. Shortly thereafter, law enforcement observed Co-

Conspirator 4 exit PREMISES 10 and meet with an occupant of a gold Lincoln for

approximately two minutes before the vehicle departed the area. On a later date, a photograph of

Co-Conspirator 4 was displayed to CS-1, who confirmed it was the same individual who

purchased one ounce of cocaine from VANDIVER on October 1, 2017 at PREMISES 6.

98.     On October 9, 2017, law enforcement observed Co-Conspirator 4 and another

male in the area of PREMISES 10 in SUBJECT VEHICLE 10. Co-Conspirator 4 and the other

individual entered and exited PREMISES 10. SUBJECT VEHICLE 10 was registered to Co-

Conspirator 4.

99.     On November 17, 2017, law enforcement observed MCALLISTER meet with Co-

Conspirator 4 prior to a football game at Freedom High School, located on Neabsco Mills Road,

Woodbridge, Virginia. Co-Conspirator 4 was operating SUBJECT VEHICLE 10. Law

enforcement observed Co-Conspirator 4 exit the passenger side of MCALLISTER's SUBJECT

VEHICLE 6 in possession of a black nylon bag and then enter SUBJECT VEHICLE 10. After

meeting with MCALLISTER, law enforcement followed Co-Conspirator 4 in SUBJECT

VEHICLE 10 to the area of PREMISES 10. Law enforcement observed Co-Conspirator 4 enter

PREMISES 10 and then later exit and meet with the same gold Lincoln from the October 5, 2017

surveillance. Law enforcement surveillance was parked close enough to overhear the

conversation between Co-Conspirator 4 and the unidentified driver of the Lincoln. Co-

Conspirator 4 sated, "Let me know how it is." Law enforcement observed Co-Conspirator 4

enter PREMISES 10 after meeting with the Lincoln. Law enforcement also observed Co-

Conspirator 4 meet with another unknown individual in the area of PREMISES 10 on the same

29

date. This second meeting was consistent with a drug transaction.

100.     Co-Conspirator 4's known cellular telephone number is in contact with VANDIVER, JOHNSON, CD-1, and HARDWICK's phones.

## USE OF CELLULAR TELEPHONES/STORAGE MEDIA BY DRUG TRAFFICKERS

101.     Based on my training, experience, and participation in narcotic and drug-related investigations, and my knowledge of this case, I know that:

    a.   It is common for individuals engaged in the distribution of controlled substances to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators;

    b.   Individuals engaging in the distribution of controlled substances use cellular telephones and cellular telephone technology to communicate and remain in constant contact with customers and the sources of those controlled substances;

    c.   Individuals who engage in the distribution of controlled substances use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging and instant messaging in addition to direct telephone conversations.  It is also common for narcotics traffickers to send photographs and videos as exchange of information with customers and/or source(s) of supply; and

    d.   Individuals who engage in the distribution of controlled substances frequently maintain information, personal records, photographs, and documents in an electronic format on computers and/or smart phones.

30

102.    In my training and experience, it is likely that the PREMISES and/or SUBJECT VEHICLES will contain at least one cellular phone because of the use of cellular phones in furtherance of the conspiracy to distribute controlled substances described above.

103.    Further, I know that VANDIVER, NILES, BAH, MCALLISTER and co-conspirators have used cellular phones to communicate about drug transactions. Moreover, during the course of this investigation, law enforcement have seized numerous cellular phones. After obtaining search warrants, law enforcement have located conversations, videos, and photographs documenting a conspiracy to distribute controlled substances.

104.    I know from my training and experience, as well as from information found in publicly available materials including those published by cellular phone providers, that some makes and models of cellular phones offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

105.    If a user enables Touch ID on a given cellular phone device, he or she can register fingerprints that can be used to unlock that device. The user can then use any the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In my training and experience, users of cellular phone devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

106.    In some circumstances, a fingerprint cannot be used to unlock a device that has

31

Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked cellular phone device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

107.    The passcode or password that would unlock the cellular phone is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the cellular phone to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant cellular phone device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

108.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the

32

device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the PREMISES and/or SUBJECT VEHICLES to press their finger(s) against the Touch ID sensor of the locked cellular phone device(s) found during the search of the Subject Premises or Subject Vehicles in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

109.    Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience, I know that it is common for a user to unlock a Touch ID-enabled cellular phone device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the cellular phone as described above within the attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

110.    Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the PREMISES or in SUBJECT VEHICLES to the Touch ID sensor of cellular phones for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

111.    After any cellular phones are seized, ATF or FBI will begin the search of the phones within the Eastern District of Virginia. If ATF or FBI cannot complete the search then agents will send the phones to a private company that specializes in data extraction from Apple iPhones and other electronics. This private company will either (a) unlock the phone(s) and then return the phone(s) to the ATF or FBI office located in the Eastern District of Virginia, where the actual analysis of the contents of the phone(s) will take place or (b) unlock the phone(s) and create a forensic image of the phone(s), and then return the phone(s) to the ATF or FBI office located in the Eastern District of Virginia, where the actual analysis of the contents of the

phone(s) will take place.

## TECHNICAL TERMS

112. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. *IP Address*: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. *Storage medium*: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

113. As described above and in Attachment B, this application seeks permission to

34

search for records that might be found on the PREMISES or in SUBJECT VEHICLES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

114. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer

35

has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

115. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the

36

attachment of peripherals, the attachment of USB flash storage devices or other

external storage media, and the times the computer was in use. Computer file

systems can record information about the dates files were created and the

sequence in which they were created, although this information can later be

falsified.

b.  As explained herein, information stored within a computer and other electronic

storage media may provide crucial evidence of the "who, what, why, when,

where, and how" of the criminal conduct under investigation, thus enabling the

United States to establish and prove each element or alternatively, to exclude the

innocent from further suspicion. In my training and experience, information

stored within a computer or storage media (e.g., registry information,

communications, images and movies, transactional information, records of

session times and durations, internet history, and anti-virus, spyware, and

malware detection programs) can indicate who has used or controlled the

computer or storage media. This "user attribution" evidence is analogous to the

search for "indicia of occupancy" while executing a search warrant at a residence.

The existence or absence of anti-virus, spyware, and malware detection programs

may indicate whether the computer was remotely accessed, thus inculpating or

exculpating the computer owner. Further, computer and storage media activity

can indicate how and when the computer or storage media was accessed or used.

For example, as described herein, computers typically contain information that

log: computer user account session times and durations, computer activity

associated with user accounts, electronic storage media that connected with the

37

computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

38

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

116. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

39

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

117.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

118. Because several people share the PREMISES as a residence and use the SUBJECT VEHICLES, it is possible that the PREMISES and/or SUBJECT VEHICLES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

119. Based on the foregoing facts, there is probable cause to believe that TARVELL VANDIVER, CHENNOR BAH, RASHOURN NILES, JERRY MCALLISTER, and other co-conspirators have conspired to distribute and possess with intent to distribute cocaine, cocaine base, and heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I submit there is also probable cause to support that VANDIVER has used and carried a firearm during and in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c). In addition, there is probable cause to believe that items and records that are evidence of these violations are currently contained in the PREMISES and/or SUBJECT VEHICLES. I submit that this affidavit therefore supports probable cause for a warrant to search

the PREMISES and/or SUBJECT VEHICLE described in Attachment A and seize the items

described in Attachment B.

Respectfully submitted,

_____

Michael A. Fernald
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me on December __, 2017.

_____

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

42

## ATTACHMENT A

*Place to be searched*

The property to be searched is 2750 Green Ash Loop #404, Woodbridge, Virginia 22192. This building is described as a four story structure designed as an apartment building. The structure has a brick exterior on the lower level and tan siding on the upper levels. All four levels are visible from the exterior. The address number "2750" is displayed horizontally in black numbers on a white background attached to the brick of the exterior on three sides of the building. All apartments in building 2750 can be accessed through two doors on the ground level. The door to apartment 404 is white in color and is located on the fourth level of the structure. The numbers "404" are posted in black on a white background to the right of the door to the apartment. This search warrant requests permission to search any safes located in the PREMISES.



## ATTACHMENT B

### *Items to be Seized*

The items to be seized are fruits, evidence, records and information relating to, contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846(a) (distribution and possession with intent to distribute cocaine and other controlled substances, and conspiracy to distribute cocaine and other controlled substances) including, but not limited to:

a. Controlled substances, packaging materials, indicia of distribution, records and documents, receipts, notes ledgers and other papers including any computerized or electronic records including cellular telephones, relating to the ordering, purchase or possession of controlled substances;

b. U.S. currency and other illicit gains from the distribution of controlled substances;

c. Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers;

d. Books, records, receipts, bank statements, and records, money drafts, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, controlled substances;

e. Documents and papers evidencing ownership of proceeds from the sale of controlled substances, storage and location of such assets and facilities to safely store and secure such items, such as safes, to include lock boxes, and strong boxes;

f. Photographs, in particular, photographs of controlled substances and photographs of individuals possessing controlled substances and photographs showing the association of individuals;

g. Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys;

h. Cellular phones, computers, and other electronic storage media or digital devices;

i. For any electronics searched, any conversations, whether through text messages or other applications, where NILES discusses the purchase and sale of cocaine and other controlled substances;

j. For any electronics searched, any photographs of controlled substances.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

    d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    h.  evidence of the times the COMPUTER was used;

    i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    k.  records of or information about Internet Protocol addresses used by the COMPUTER;

    l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

    m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives,

videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical,

or other high speed data processing devices performing logical, arithmetic, or storage functions,

including desktop computers, notebook computers, mobile phones, including "smart" phones,

tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can

be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and

other magnetic or optical media.

During the execution of the search of the PREMISES described in Attachment A, law

enforcement personnel are authorized to press the fingers (including thumbs) or obtain facial

recognition of individuals found at the PREMISES to the Touch ID sensor of cellular phones

found at the PREMISES for the purpose of attempting to unlock the device via Touch ID or

facial recognition in order to search the contents as authorized by this warrant.

## ATTACHMENT C

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | **UNDER SEAL** |
| v. | Case No. 1:17-mj-556 |
| RASHOURN NILES,<br>a/k/a "Ray" | The Hon. Theresa Carroll Buchanan |
| Defendant. | |



**AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANTS**

I, Michael A. Fernald, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1.       I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF") and have been so employed since 2014.  I am currently assigned to the Falls

Church II Field Office within the Washington Field Division.  Prior to my employment with

ATF, I was a sworn police officer in the Commonwealth of Virginia from 2003 to 2014 and

served in multiple capacities.

2.       During the course of my career, I have participated in the investigation of

narcotics traffickers and possessors.  Many of these investigations led to the arrest and

conviction of narcotics dealers.  In the course of conducting these investigations, I have used

several different kinds of investigative techniques, including:  interviewing informants and

cooperating sources; conducting physical surveillance; conducting short-term and long-term

undercover operations, including reverse undercover operations; consensual monitoring and

recording of both telephonic and non-telephonic communications; analyzing telephone pen

register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants, which have led to substantial seizures of narcotics, firearms, contraband, and drug related assets; and, the analysis of financial documents and records.

3.      I submit this affidavit in support of a criminal complaint and arrest warrant for RASHOURN NILES (a/k/a "Ray") for unlawfully, knowingly, and intentionally combining, conspiring, confederating and agreeing with others, both known and unknown, to unlawfully, knowingly and intentionally distribute and possess with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

4.      This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

5.      During the course of this investigation, law enforcement debriefed and used multiple cooperating sources. Regardless of the cooperating sources' gender, they will be referred to in the masculine gender. The cooperating sources have proven to be reliable and credible.

2

I.    **Background on the Imperial Gangsta Blood Street Gang**

  A. The United Blood Nation

  6. Based on my research and information provided to me by cooperating sources, the United Blood Nation ("UBN") on the East Coast was established in 1993 on Rikers Island. UBN was formed to combat the oppression of all black people by the Latin Kings and Nietas. It is an association of independent, structured groups ("Hoods") operating both in and outside of prison. There are four different "Nations" making up the United Blood Nation ("UBN"). The Nations of the UBN currently include: (1) New York Blood Brim Army (N.Y.B.B.A.); (2) Almighty Blood Stone Villain Nation (A.B.S.V.N.); (3) New York Bloods (N.Y.B.); and, (4) United Stone Gorilla Nation (U.S.G.N.). The UBN has a council composed of a Godfather (highest-ranking member) for every UBN Hood and all Hoods have an equal vote on matters pertaining to the UBN as a whole. A committee of Godfathers also exists to provide guidance to the UBN. The UBN is reportedly in the midst of a reorganization, where poor performing Hoods are being "clapped" or incorporated into a higher performing Hoods. There were eight (8) original Hoods in the UBN. The UBN now consists of twelve (12) Hoods, including: (1) Imperial Gangsta Bloods ("IGB"); (2) 9-Trey Gangsta Bloods; (3) G-Shine Bloods; (4) 3 Street Gangsta Bloods; (5) Valentine Bloods; (6) Ericket Hunter Bloods; (7) Double 9 Gangstas; (8) East Gangsta Bloods; (9) Murderous Mad Dogs; (10) 5 Star Gangsta Bloods; (11) Fayette Street Mobb; and (12) Gangland Gangsta Bloods.

  7. According to the National Drug Intelligence Center, most UBN sets derive illicit proceeds from the distribution of cocaine hydrochloride, cocaine base, heroin, and marijuana. UBN members are known by law enforcement to transport large quantities of drugs for distribution throughout the east coast. According to estimates, the UBN may exceed 7,000

members. Most members are African American males; however, many sets will recruit members of other races and ethnic backgrounds. Historically, female members and associates take active roles by holding drugs and firearms for members.

### B. The Imperial Gangsta Bloods

8. The IGB (also known as "Str8 Gangsta") has its own history, oath, pledge and rules in addition to the UBN's. IGB was "birthed" on March 27, 2002, in Comstock, New York. The IGB Oath is, "I take this oath as my life to IGB, a chapter of UBN, to respect my brother and sister and to trust in them. To honor my Nation with loyalty and love as Royalty should, with my flag on my side and five in my stride. My neighborhood be Imperial." The IGB Pledge is, "I take this pledge to IGB, representing strength and understanding to bring for nobility and righteousness. To guide my hood effectively, with wisdom and honor, to stand strong in the face of all adversaries. I be that Imperial Gangsta Blood." The five royal rules of the IGB are (1) communication is an absolute must, (2) absolutely no cowardly act, (3) obey all orders given, (4) never deny royalty, and (5) never leave royalty in a battle.

9. Every Hood in the UBN is allowed to have five (5) sub-districts. The IGB sub-districts include: (1) Blood Line Imperial; (2) B Gang Imperial; (3) Gangsta Blood Imperial; (4) Blood Money Imperial; and, (5) Mob Style Imperial.

10. Like UBN, IGB members greet each other with a universal handshake and then display their particular Hood's hand sign. Members will say "Peace Blood" or "Peace Almighty" while performing the handshake.

11. As stated above, the IGB are a Hood within the UBN and therefore its organization is similarly structured. The IGB organization from lowest to highest rank is: Foot Solider or Scrap, Green Light, 1-Star General or Minister of Communication, 2-Star General or

Minister of Education, 3-Star General or Minister of Security, 4-Star General or Minister of Finance, 5-Star General or Minister of War. In addition, IGB has the ranks of Low 020, High 020, and Godfather. Members also use code words to conceal the rank held by individuals. Within IGB, the Low 020 is referred to as the "Noble" and the High 020 is referred to as the "G Noble." Members that hold a rank above Low 020 will not participate in gang war as they are considered leadership. The rank structure within IGB carries authority only within their specific geographic area. IGB members who are well known to members in multiple geographic areas and known to travel frequently can be given "World Wide" status. World Wide status means that their rank and level of authority carries to whatever geographic area they are physically present in.

## II.    Background on the Investigation

12.    In March 2017, the ATF and the Federal Bureau of Investigation ("FBI") began jointly investigating the IGB within the Northern Virginia area and elsewhere. IGB members are known by law enforcement to be involved in narcotics distribution, firearms trafficking, home invasions, robberies, assaults, and homicides in Virginia, the District of Columbia, and Maryland.

13.    In February 2017, a cooperating source ("CS-1") reported to the Prince William County Police Department that TARVELL VANDIVER ("VANDIVER") was a narcotics distributor. CS-1 is an IGB member. CS-1 will be referred to in the masculine gender, regardless of CS-1's true gender. CS-1 has been convicted of two felonies, including robbery and a probation violation. CS-1 was arrested in December of 2016, in Maryland, for possessing a stolen firearm as a convicted felon and possession of controlled substances. CS-1 originally cooperated because he hoped to receive a lesser sentence. Based on CS-1's cooperation, his

5

charges were dismissed. CS-1 continues to cooperate because he is being compensated. CS-1 also hopes to be relocated.

14.    CS-1 informed law enforcement that members of the IGB located in Northern Virginia and their associates were involved in the distribution of controlled substances, firearms, and have committed acts of violence, including armed home invasions, robberies, and murder. CS-1 has purchased cocaine from VANDIVER since 2014. VANDIVER was identified by CS-1 as an IGB member of high rank. VANDIVER taught CS-1 how to manufacture cocaine base. CS-1 also informed law enforcement that VANDIVER's stepfather, RASHOURN NILES ("NILES"), is VANDIVER's primary source of supply for controlled substances.

**III.    Northern Virginia IGB Members in this Investigation**

15.    According to CS-1, the defendants charged in this or one of the related complaints hold the ranks or positions listed below. CS-1 informed law enforcement that the IGB in this area use slightly different rank names than the ranks described in the previous section. Their roles and responsibilities remain similar.

16.    VANDIVER is one of the lead targets of this investigation and law enforcement identified him as holding the IGB rank of HIGH 020. VANDIVER is reported to be the superior in this region. VANDIVER coordinates with leadership in multiple states, oversees the set, calls for regional and local meetings, and acts as the disciplinary officer for the set.

17.    CS-1 holds the rank of 4-Star General and was appointed the treasurer for the region.

18.    BRANDON EDLER (also known as "Livewire") is a scrap or foot soldier. CS-1 reported EDLER has no authority in the gang and cannot invite new members to join. EDLER cannot serve as a mentor or "Big Homie."

6

**IV.     Law Enforcement Contact with northern Virginia IGB Members and Associates**

19.     In September 2008, the ATF arrested NILES for conspiracy to distribute cocaine base (also known as "crack" cocaine). NILES pleaded guilty in the Eastern District of Virginia to gun and drug charges and was sentenced. NILES was interviewed and admitted to being involved in the distribution of controlled substances since early 2005. NILES admitted he began selling marijuana in 2005 and cocaine hydrochloride and cocaine base in or around 2006. From fall 2006 to fall 2008, NILES estimated he sold on average 4.5 ounces of cocaine base per week. NILES also admitted to providing VANDIVER with 1/8 ounce quantities of cocaine base at the time.

20.     In April 2009, a victim contacted PWCPD and stated he had ordered a quantity of marijuana from a co-conspirator ("Co-Conspirator 1"). When the victim entered Co-Conspirator 1's vehicle, he was "shocked" with a stun gun by Co-Conspirator 1's friend "VEL." The victim reported he was punched, kicked, and "shocked" multiple times by Co-Conspirator 1 and "VEL." The victim reported he knew "VEL" to be regularly armed with a firearm. "VEL" is one of VANDIVER's known aliases. VANDIVER and Co-Conspirator 1 currently reside together at 1288 Bayside Avenue #11, Woodbridge, Virginia and continue to distribute controlled substances from the residence.

21.     In November 2014, the Rappahannock Area Gang Information network received intelligence that monthly IGB gang meetings had been taking place at VANDIVER's home in Dumfries, Virginia. VANDIVER was reportedly living with another IGB member and traveling often to Norfolk, Virginia, and New York. The source stated that VANDIVER was a 5-Star General and that PLATINUM (who is CS-1) was a 1-Star General.

7

22.     In January 2015, the FBI obtained information about the IGB and UBN being re-organized into five "branches" in Virginia, each with its own leadership. The source of information reported VANDIVER had been promoted to the Low 020 position in Northern Virginia. The source also identified MONTREUS PETERSON ("PETERSON") and PLATINUM (CS-1) as members of the IGB.

23.     In April 2015, the PWCPD responded to a shooting incident in Woodbridge, Virginia, in which three individuals were struck with bullets. During the investigation, PWCPD learned there was a birthday party on Filarette Street. A group of individuals arrived at the party and wanted to enter. When the individuals were denied entry, the group became confrontational and claimed that as Bloods members they were owed more respect. Shortly after the confrontation, one of the Bloods members entered a vehicle and fired multiple gunshots in the direction of the residence and struck three individuals as the vehicle was driving away. A source came forward to PWCPD and identified a Bloods member ("Unnamed IGB Member 1") and another individual as being involved in the shooting. Forensic evidence led investigators to believe there was one shooter because all casings recovered from the scene were fired from the same .40 caliber firearm.

24.     Days later in April 2015, the PWCPD stopped a vehicle in Dumfries, Virginia, and encountered ISHMIL RYSHEEM HARDWICK ("HARDWICK") and Unnamed IGB Member 1. PWCPD officers detected an odor of marijuana emanating from the vehicle, which resulted in the occupants of the vehicle being detained. Law enforcement then conducted a probable cause search of the vehicle. Unnamed IGB Member 1 was the front passenger and HARDWICK was a rear passenger of the vehicle. Inside the unlocked glove box, PWCPD personnel located and seized a Raven .25 caliber pistol, a Rossi .38 caliber revolver, a quantity of

8

suspected cocaine, and a quantity of marijuana. A round of .38 caliber ammunition was located under the rear passenger seat where HARDWICK was seated.

25.     In June 2015, the Washington, D.C. Metropolitan Police Department ("MPD") responded to a shooting in the area of Galveston Place, S.W. Upon their arrival, a Bloods member ("Unnamed IGB Member 2") was found deceased from multiple gunshot wounds. Unnamed IGB Member 2 was reportedly a drug distributor.

26.     In July 2015, the PWCPD responded to a residence on Port Hope Point in Triangle, Virginia, for a shooting into an occupied dwelling. A subject had knocked on the door of an individual's home ("Individual 1") asking for a family member, who was one of the MPD murder suspects for the murder mentioned in the previous paragraph. Individual 1 did not answer the door and the next day unknown subjects fired at the residence.

27.     Also in July 2015, the PWCPD stopped a vehicle for an expired registration and upon approaching the vehicle, PWCPD personnel detected an odor of marijuana emanating from the vehicle. Unnamed IGB Member 1 was the driver of the vehicle and did not have a valid operator's license. Upon being removed from the vehicle and detained, another occupant fled the vehicle. When law enforcement apprehended the passenger, law enforcement seized a stolen Smith & Wesson 9mm pistol from the passenger's waistband.

28.     In early August 2015, SADE ANGLIN ("ANGLIN") showed up at Individual 1's employer and got into a physical altercation with Individual 1. Several days later, both women got into another altercation at a bar in Woodbridge. More specifically, Individual 1 and another individual ("Individual 2") were at a bar, when Individual 2 received a text that she and her friend needed to leave because something was going to happen them. When Individual 2 and her friend approached their vehicle, they realized one of their tires had been slashed. Individual 1

9

reported to law enforcement that she observed VANDIVER, ANGLIN, and other individuals walking towards them. Individual 1 stated that she then grabbed a box cutter for protection when she was punched by a male. Individual 1 reported she fell unconscious and awoke to ANGLIN punching and kicking her. Individual 1 reported to PWCPD that she picked up the box cutter and started swinging it to get her attackers away. ANGLIN's brother then grabbed Individual 1 and caused her to drop the box cutter again. ANGLIN then began punching and kicking her again. Individual 1 also reported VANDIVER punched her in the face.

29.     In November 2015, the PWCPD again encountered Unnamed IGB Member 1 in Woodbridge, Virginia. The PWCPD had received a narcotics tip in the area of Wrangler Lane and upon their arrival in the area detected an odor of marijuana. PWCPD personnel made contact with two individuals, including Unnamed IGB Member 1, who was observed leaning into a parked vehicle. Unnamed IGB Member 1 was observed making a furtive gesture from his left inside shoulder area of his jacket to the interior of the vehicle. PWCPD personnel detained Unnamed IGB Member 1 and conducted a search of his person and the vehicle. Law enforcement identified an empty firearm holster under Unnamed IGB Member 1's shoulder. Inside the vehicle, PWCPD personnel located and seized a Springfield Armory XD .40 caliber pistol.

30.     In November 2015, the PWCPD were dispatched to a report of a brandishing of a firearm. The suspect was identified as a member of the Bloods; however, the Victim ("Individual 3") did not want to file charges out of fear of retaliation. Individual 3 informed law enforcement about a shooting at a party on Filarete Street in which several individuals "got shot up." Individual 3 identified Unnamed IGB Member 1 as the shooter and further reported hearing Unnamed IGB Member 1 brag about being responsible for the 89th and 90th murders in

10

Washington, D.C. Individual 3 grew up with Unnamed IGB Member 1. Individual 3 stated that Unnamed IGB Member 1 had also reported he was present when Unnamed IGB Member 2 was killed in June 2015. Individual 3 further reported Unnamed IGB Member 1 was trying to make a name for himself within the Bloods.

31.     In April 2016, the PWCPD received information on IGB working with another area gang. IGB was reported to be working with SQAD, a reported music production group. Members were involved in narcotics and firearm distribution, robbery, home invasions, and theft. VANDIVER allegedly provided the firearms observed in music videos and NASIRU CAREW ("CAREW") allegedly supplied the money for the production. CAREW is known to be the head of I Got Me ("IGM"), which is a drug distribution network out of San Diego, California.

32.     In October 2016, the PWCPD received information that VANDIVER was a 5-Star General with the IGB. The source of information stated VANDIVER has females rent apartments under their names. The source stated VANDIVER would carry narcotics attached to his scrotum to avoid detection by law enforcement. The source also provided information on individuals reported to be VANDIVER's "inner circle." CAREW was part of this inner circle and was reported to be a narcotics source with ties to California.

33.     In December 2016, the PWCPD conducted a knock and talk at a residence on Greendale Drive in regards to HARDWICK. The PWCPD received information that HARDWICK was distributing controlled substances from the residence and had stolen guns from an elderly resident. When they made contact with the owner of the home, he told PWCPD that HARDWICK was no longer allowed at the residence because he had stolen firearms from his residence. The stolen firearms included a Smith & Wesson .40 caliber pistol and a Colt 1911

.45 caliber pistol. HARDWICK told the homeowner he was a "lick" (common street term for a robbery).

## V.    Probable Cause

34.    During the course of this investigation, law enforcement coordinated numerous controlled purchases of controlled substances from, or through, VANDIVER. In each instance where a cooperating source conducted a law enforcement directed purchase of controlled substances, the cooperating source was searched for contraband before and after the transaction. During each transaction, audio and/or video recorders were used in conjunction with law enforcement surveillance. Further, all of the controlled substances purchased were submitted for laboratory testing. Below, I do not detail each and every purchase of controlled substances; rather, I focus only on the significant purchases for the purposes of this affidavit. However, the below table does detail each law enforcement directed purchase in this investigation, including controlled purchases for all controlled substances; though, in this affidavit I will only seek a charge for conspiracy to distribute cocaine or cocaine base (depending on the defendant). Both substances are Schedule II controlled substances.

| Number | Date | Drug | Amount | Lab Test |
|--------|------|------|--------|----------|
| 1 | 03/02/2017 | Cocaine | 27.71 grams | Cocaine HCL |
| 2 | 03/11/2017 | Cocaine | 27.92 grams | Cocaine HCL |
| 3 | 03/23/2017 | Cocaine | 55.75 grams | Cocaine HCL |
| 4 | 03/28/2017 | Heroin | 3.55 grams | Fentanyl |
| 5 | 03/30/2017 | Cocaine | 123.12 grams | Cocaine HCL |
| 6 | 03/30/2017 | Heroin | 3.44 grams | Fentanyl/Heroin |
| 7 | 04/06/2017 | Cocaine Base | 108.82 grams | Cocaine Base |
| 8 | 04/06/2017 | Cocaine | 27.92 grams | Cocaine HCL |
| 9 | 04/25/2017 | Heroin | 75.17 grams | Fentanyl/Heroin |
| 10 | 05/02/2017 | Heroin | 86.40 grams | Heroin |
| 11 | 05/04/2017 | Cocaine Base | 185.10 grams | Cocaine Base |
| 12 | 05/09/2017 | Cocaine | 27.98 grams | Cocaine HCL |
| 13 | 05/10/2017 | Cocaine Base | 14.58 grams | Cocaine Base |
| 14 | 05/17/2017 | Cocaine Base | 25.75 grams | Cocaine Base |
| 15 | 05/18/2017 | Marijuana | 41.08 grams | Marijuana |
| 16 | 05/24/2017 | Cocaine Base | 41.08 grams | Cocaine Base |
| 17 | 05/25/2017 | Heroin | 54.31 grams | Heroin |
| 18 | 06/01/2017 | Heroin | 49.49 grams | Heroin |
| 19 | 06/02/2017 | Cocaine Base | 41.97 grams | Cocaine Base |
| 20 | 06/08/2017 | Cocaine Base | 32.73 grams | Cocaine Base |
| 21 | 06/15/2017 | Heroin | 46.61 grams | Heroin |

13

| Number | Date | Drug | Amount | Lab Test |
|---|---|---|---|---|
| 22 | 06/16/2017 | Cocaine Base | 55.35 grams | Cocaine Base |
| 23 | 06/22/2017 | Cocaine Base | 66 grams est. | Lab Pending |
| 24 | 07/06/2017 | Cocaine Base | 29 grams est. | Lab Pending |
| 25 | 07/26/2017 | Cocaine Base | 27.40 grams | Cocaine Base |
| 26 | 07/27/2017 | Marijuana | 1,266.9 grams | Marijuana |
| 27 | 08/11/2017 | Cocaine Base | 54.13 grams | Cocaine Base |
| 28 | 08/17/2017 | Cocaine Base | 52.81 grams | Cocaine Base |
| 29 | 08/31/2017 | Cocaine Base | 369.89 grams | Cocaine Base |
| 30 | 10/30/2017 | Cocaine HCL | 505 grams est. | Lab Pending |
| 31 | 11/09/2017 | Heroin | 43 grams est. | Lab Pending |

A.    Controlled Purchase of Cocaine from VANDIVER on March 2, 2017

35.    On March 2, 2017, CS-1, at law enforcement direction, contacted VANDIVER and ordered one (1) ounce of cocaine. VANDIVER traveled with CS-1 to a residence located on East Longview Drive in Woodbridge, Virginia, within the Eastern District of Virginia. Inside the apartment, CS-1 observed a black pistol in plain view sitting on a table in the living room. VANDIVER retrieved approximately three (3) ounces of cocaine from a suitcase in the living room, separated one (1) ounce of cocaine from the larger quantity, and provided it to CS-1. CS-1 in return paid $1,300 in documented funds to VANDIVER. After the transaction, law enforcement displayed a photograph of VANDIVER to CS-1 and CS-1 positively identified him. The cocaine was submitted to the Drug Enforcement Administration ("DEA") Mid-Atlantic Laboratory and tested positive for 27.71 grams of cocaine hydrochloride.

14

B.      IGB Gang Meeting and Controlled Purchase of a Firearm and Cocaine on March
        11, 2017

36.     On March 8, 2017, CS-1 reported to law enforcement that there would be an IGB

gang meeting on March 11, 2017. CS-1 reported VANDIVER would be at the meeting and that

he would be able to purchase cocaine from him. On March 11, 2017, the meeting took place at

the Hilton Garden Inn, which is located on 2500 Neabsco Common Place, Woodbridge, Virginia.

37.     Prior to the gang meeting, CS-1 granted law enforcement access to the hotel room

to place audio/video recorders in the room. Based on law enforcement's review of the recording,

CS-1's description of the events and conversations at the gang meeting was accurate.

38.     Prior to other IGB members arriving to the hotel room, CS-1 and VANDIVER

discussed firearms. VANDIVER reported he knew whom to call in order to obtain a firearm.

VANDIVER then called HARDWICK (also known as "Ish") via FaceTime and negotiated a

price for a firearm that HARDWICK was willing to sell. HARDWICK reported to CS-1 and

VANDIVER that he had paid $400 for the firearm and had purchased a magazine for the firearm.

CS-1 and HARDWICK agreed to a price of $500 for the firearm.

39.     Based on a review of HARDWICK's criminal history, law enforcement

determined that HARDWICK has been convicted of multiple offenses in the Commonwealth of

Virginia, which exposed him to more than one year of incarceration, including a conviction in

Prince William County Circuit Court of possession with intent to distribute a Schedule I or II

controlled substance, in violation of Code of Virginia § 18.2-248. HARDWICK is therefore

prohibited from possessing firearms under federal law.

40.     The meeting started later in the evening and was audio and video recorded by law

enforcement. Several IGB members attended the meeting, including, but not limited to,

15

VANDIVER, PETERSON (also known as "Impact"), HARDWICK, BRANDON EDLER (also known as "Livewire"), Unnamed IGB Member 3 and others.

41.     During this meeting, gang members discussed trafficking firearms to New York. Further, the gang members discussed ripping up the flooring of vehicles to conceal firearms. Several gang members arrived prior to HARDWICK, who law enforcement observed arrive at approximately 6:05 p.m. HARDWICK entered the hotel room and removed a black pistol from his waistband. HARDWICK handed the firearm to CS-1, while discussing other firearms. CS-1 paid HARDWICK the agreed upon $500.

42.     After CS-1 took possession of the firearm, several gang members also possessed the firearm, including PETERSON. Law enforcement reviewed the video of the meeting and confirmed that PETERSON held the firearm. Based on a review of PETERSON's criminal history, it was determined that PETERSON has been convicted of multiple offenses in the Commonwealth of Virginia, which exposed him to more than one year of incarceration, including a conviction in Prince William County Circuit Court of possession with intent to distribute a Schedule I or II controlled substance, in violation of Code of Virginia § 18.2-248.

43.     Later that evening, CS-1 and VANDIVER left the hotel in CS-1's vehicle. Law enforcement followed CS-1 from the hotel to a Wal-Mart parking lot located on Worth Avenue. CS-1 stated that VANDIVER called his "molly" (also known as methylenedioxymethamphetamine or MDMA) source of supply and that VANDIVER was told to meet at that location. While CS-1 and VANDIVER waited in the vehicle, an individual approached CS-1's vehicle and leaned through the open window to speak with VANDIVER. CS-1 later positively identified RASHOURN NILES from a DMV photograph, as being the individual who leaned through CS-1's window to speak with VANDIVER. NILES made a

16

statement to VANDIVER to the effect of "you know what I drive," followed by a description of where his vehicle was parked within the parking lot. CS-1 drove VANDIVER to the specified location where he reported VANDIVER entered a black BMW SUV ("Subject Vehicle 1"), retrieved an unknown quantity of molly, and left cash payment for the molly within the vehicle.

44.     After departing the Wal-Mart parking lot, CS-1 and VANDIVER drove to a residence located on Bayside Avenue in Woodbridge and entered a co-conspirator's ("Co-Conspirator 2") apartment. Inside the apartment, CS-1 purchased one (1) ounce of cocaine for $1,300 in documented funds from VANDIVER. The cocaine was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 27.92 grams of cocaine hydrochloride.

45.     CS-1 reported that HARDWICK also arrived at the apartment to pick-up a quantity of cocaine. VANDIVER and HARDWICK had worked out a deal in which HARDWICK brought $140 in alcohol and VANDIVER paid him back double that amount in cocaine. CS-1 also reported VANDIVER provided Co-Conspirator 2 with cocaine. CS-1 stated that Co-Conspirator 2 sold cocaine and cocaine base from his apartment and allowed VANDIVER to sell and store cocaine in the apartment.

46.     CS-1 learned the molly purchased by VANDIVER from NILES and a quantity of cocaine were for EDLER. An additional quantity of molly was for PETERSON as well.

47.     CS-1 later turned over the firearm he purchased from HARDWICK to law enforcement. The firearm is a Walther model PPX 9mm pistol. Based upon my training and experience, I know the Walther pistol to be a firearm as that term is defined under Title 18, United States Code, Section 921(a)(3).

17

C.     Controlled Purchase of Cocaine from VANDIVER on March 23, 2017

48.     On March 23, 2017, CS-1, at law enforcement direction, contacted VANDIVER

to order two (2) ounces of cocaine. VANDIVER instructed CS-1 to meet him at a restaurant in

Woodbridge. Law enforcement observed VANDIVER meet with NILES, who was driving

Subject Vehicle 1, at a gas station adjacent to the restaurant. CS-1 then met with VANDIVER

and they both departed the area in VANDIVER's vehicle. VANDIVER reported Unnamed IGB

Member 3 had just purchased an ounce of cocaine from VANDIVER and PETERSON was

going to buy an ounce in the future. VANDIVER also reported to CS-1 that the firearm

Unnamed IGB Member 1 was caught with belonged to VANDIVER. VANDIVER went on to

say, "I'm not talking about the body, I'm talking about the strap (firearm)." VANDIVER stated

it was, "One of my clean straps that I bought from [Individual 4]. [Individual 4] bought it from

his white boy out the gun store, the clean joints." Individual 4 had been recently arrested during

an NYPD investigation into firearms trafficking to NY.

49.     VANDIVER drove with CS-1 to an address located on Bellona Road in

Woodbridge. Inside the apartment, VANDIVER reported to CS-1 that he had just met with his

stepfather (NILES) before meeting CS-1. SADE ANGLIN (also known as "Pooh") is the tenant

in this apartment. CS-1 reported ANGLIN has a relationship with VANDIVER. CS-1 further

reported ANGLIN kept a "draco" pistol in the residence. When CS-1 and VANDIVER entered

ANGLIN's apartment, VANDIVER removed a bag containing cocaine from his person.

VANDIVER and CS-1 then went to a bedroom where a scale was sitting out in the open on top

of a piece of furniture. VANDIVER had a little over two (2) ounces of cocaine, which they

weighed out. CS-1 agreed to purchase the cocaine for $2,600 in documented funds. The cocaine

was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 55.75 grams of cocaine hydrochloride.

50.     VANDIVER then called a subject later identified as HARDWICK and informed him that he's "got an eighth of that bitch (cocaine) left, you straight?" VANDIVER further stated, "Yeah, it's 3.8 too."

51.     After leaving ANGLIN's apartment, VANDIVER and CS-1 drove to Ashdale Plaza in Woodbridge. HARDWICK was observed by law enforcement pulling into the same parking lot. CS-1 reported HARDWICK met with VANDIVER and told him he was trying to obtain an ounce of cocaine. HARDWICK then reported he had a new source of heroin in the city (D.C.). HARDWICK stated that he sold the heroin in Virginia and made almost $1,000. HARDWICK further stated that he currently had eight (8) grams of heroin and would provide VANDIVER a "trey five" (3.5 grams or 1/8 ounce commonly referred to as an 8-ball) for $300. VANDIVER then sold his remaining 3.8 grams of cocaine to HARDWICK. After the transaction, law enforcement followed HARDWICK to a residential area near Ferrara Terrace and Filarete Street in Woodbridge, Virginia.

D.     Controlled Purchase of Heroin from HARDWICK on March 28, 2017

52.     On March 28, 2017, CS-1, at law enforcement direction, contacted HARDWICK and ordered a quantity of heroin. When CS-1 arrived at the agreed meeting location, HARDWICK was not present and did not answer his phone. CS-1 then contacted VANDIVER, who provided CS-1 with HARDWICK's address on Ferrara Terrace. CS-1 attempted to make contact with HARDWICK at the residence, however, HARDWICK did not answer. CS-1 then met up with VANDIVER and entered VANDIVER's vehicle. HARDWICK eventually made contact with CS-1 and VANDIVER and told them both to come by his residence later.

19

53.     While driving, VANDIVER made a FaceTime call to NILES and asked NILES if he had more than the four and a half (cocaine). VANDIVER and CS-1 discussed purchasing a quantity of cocaine together, which would cost CS-1 $5,400 for his share. VANDIVER reported he would pick up the cocaine. VANDIVER then placed a call to ANGLIN and informed her that he was stopping by. VANDIVER then drove to ANGLIN's residence and he entered along with CS-1. VANDIVER, ANGLIN, and CS-1 entered a back bedroom where VANDIVER retrieved an unspecified amount of cocaine that was stored in a shoebox in ANGLIN's closet. CS-1 reported it was the same bedroom that ANGLIN kept her "draco" pistol in under the bed. CS-1 was also able to photograph what appeared to be multiple ounces of cocaine in a box stored within a shoebox containing women's UGG boots.

54.     Law enforcement confirmed ANGLIN did in fact purchase a Century Arms Incorporated model C39 7.62x39 caliber pistol in July 2016. This pistol is commonly referred to as a "draco" pistol. CS-1's description of the pistol was corroborated by her firearm transaction. As explained above, CS-1 stated ANGLIN kept the pistol under her bed. Further, this was the same bedroom cocaine was being stored in and a digital scale was present in.

55.     It was evident to CS-1 that ANGLIN knew what was being stored in her apartment and where it was located. ANGLIN also had children present in the apartment with her.

56.     VANDIVER and CS-1 departed ANGLIN's residence and then travelled to HARDWICK's residence. HARDWICK then exited his residence and entered VANDIVER's vehicle. HARDWICK provided CS-1 with approximately four (4) grams of heroin in return for $300 in documented funds. The suspected heroin was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 3.55 grams of fentanyl, a Schedule II controlled substance.

20

57. After the transaction, law enforcement conducted an employment check on ANGLIN. ANGLIN reported less than $600 income in the first quarter of 2017, despite living in an apartment that costs a great deal more monthly. According to ANGLIN's phone records, she is in contact not only with VANDIVER, but several other co-conspirators in this investigation.

E. Controlled Purchase of Cocaine from VANDIVER and Heroin from HARDWICK on March 30, 2017

58. On March 30, 2017, CS-1, at law enforcement direction, contacted HARDWICK and ordered a quantity of heroin and a firearm. HARDWICK advised he only had heroin at that time and CS-1 agreed to purchase a quantity of heroin. At the same time, CS-1 ordered a "four deuce" (4.5 ounces) of cocaine from VANDIVER.

59. CS-1 met with VANDIVER at the Potomac Mills Mall and entered his (VANDIVER's) vehicle. A FaceTime call was placed to HARDWICK in which they discussed "dawgs" (guns) and "food" (heroin). HARDWICK reported he did not have any guns and offered to introduce CS-1 to his source of supply in Washington, D.C. for the heroin. HARDWICK described the source as an older male in his 40's who was "on the run for life, he can't even come to VA." This source of heroin is believed to be the same source of supply for JAVELL JOHNSON (also known as "JACK"). HARDWICK reported he had just met his "Minnesota Ave" source and picked up seven (7) grams of heroin. This is consistent with JOHNSON who would meet his source of supply for heroin on Minnesota Avenue. CS-1 informed HARDWICK that he would purchase the heroin and HARDWICK ended the call by telling him, "You know where I'm at" (his residence).

21

60.     VANDIVER informed CS-1 that another IGB member had been robbed by unknown males in the Richmond or Norfolk area.  VANDIVER expressed that he was upset that gang members had not yet retaliated.

61.     VANDIVER received a phone call in which an unidentified caller reported he wanted a half ounce of cocaine.  VANDIVER agreed to meet the unidentified caller later that day and agreed to sell the cocaine for $700.  The unidentified individual called VANDIVER again and asked if he was ready.  VANDIVER reported he was pulling up to "the spot" now and asked the caller to meet at the Popeye's.  VANDIVER and CS-1 then drove to "the spot" which turned out to be ANGLIN's residence on Bellona Road.  VANDIVER called ANGLIN before they arrived.

62.     While inside ANGLIN's residence, CS-1 observed ANGLIN and two to three young children in the apartment.  ANGLIN can be heard on a recording talking with VANDIVER and CS-1.  CS-1 reported VANDIVER retrieved an Ugg shoebox from the top shelf of ANGLIN's bedroom closet and that the box contained an unknown quantity of cocaine. CS-1 reported VANDIVER weighed out and then packaged 4.5 ounces of cocaine for him. While preparing the cocaine VANDIVER placed a phone call to NILES, which is supported both by CS-1's statements and telephone toll records.  During this call, VANDIVER and NILES clarify the weight of cocaine that VANDIVER purchased from him earlier.  VANDIVER provided the cocaine to CS-1, who in return paid $5,400 in documented funds.  The cocaine was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 123.12 grams of cocaine hydrochloride.

63.     Later in the evening, CS-1 and VANDIVER communicated with HARDWICK via FaceTime.  HARDWICK reported he would be home soon.  VANDIVER drove CS-1 to

22

HARDWICK's residence. CS-1 reported HARDWICK walked to VANDIVER's vehicle from his residence and entered the vehicle. HARDWICK reported he was unable to obtain a firearm for CS-1. HARDWICK then provided CS-1 with approximately four (4) grams of heroin in return for $300 in documented funds. The suspected heroin was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 3.44 grams of a mixture containing fentanyl and heroin.

F.   Controlled Purchase of Cocaine Base and Cocaine from VANDIVER on April 6, 2017

64.   On April 6, 2017, CS-1, at law enforcement direction, contacted VANDIVER via FaceTime to order two (2) ounces of cocaine base (also known as "crack" cocaine) and one (1) ounce of cocaine. VANDIVER told CS-1 to "let him call my peoples and see if we can do it at the house real quick" (manufacture cocaine base). VANDIVER's toll records revealed he called ANGLIN's known telephone number. A short time later, VANDIVER called CS-1 and directed him to ANGLIN's residence.

65.   When CS-1 entered ANGLIN's apartment, VANDIVER, ANGLIN, and children were present. VANDIVER began to manufacture cocaine base, while discussing his process with CS-1. ANGLIN was also present during the cooking of the cocaine base and conversation. At one point, VANDIVER received a phone call and ANGLIN took the call on his phone. She could be heard relaying a question to VANDIVER from whomever she was speaking. Around the same time, one of the children could be overheard asking ANGLIN a question and ANGLIN responded to the child. According to CS-1, VANDIVER was using various kitchen utensils, a bowl, and the microwave to manufacture the cocaine base. VANDIVER told CS-1 that when he

23

manufactures cocaine base, he lets it sit out overnight even though the cocaine gets hard after approximately one hour.

66.     According to call records, VANDIVER then received a phone call from MICHAEL LEDERER's known telephone number. LEDERER's phone number was identified through toll records and a law enforcement database. VANDIVER agreed to meet LEDERER. A short time later, VANDIVER left out the manufactured cocaine base to dry at ANGLIN's apartment. VANDIVER and CS-1 exited ANGLIN's apartment where she remained and entered VANDIVER's vehicle. Law enforcement followed VANDIVER and CS-1 to a McDonalds in Ashdale Plaza.

67.     While waiting for LEDERER to arrive, VANDIVER reported that Unnamed IGB Member 3 was getting straight onions (ounces of cocaine) every week.

68.     VANDIVER then received a FaceTime call from CAREW. CAREW asked VANDIVER what he was doing and he replied, "Just got out of the kitchen whipping" (manufacturing cocaine base).

69.     Law enforcement next observed VANDIVER exit his vehicle, while speaking on the phone to CAREW and meeting with LEDERER. VANDIVER returned to his vehicle and informed CS-1 that he had just made a sale. Law enforcement then observed LEDERER conduct a hand-to-hand transaction with a female in the same parking lot.

70.     VANDIVER and CS-1 then drove back to ANGLIN's residence. Inside the residence, VANDIVER made a FaceTime call to NILES and informed him that he had let the cocaine base sit out for about an hour, but that the cocaine was still soft. NILES told VANDIVER to put the cocaine back in the microwave. VANDIVER can be heard on the recording calling out to ANGLIN and asking her if the hair-dryer worked because it was not

24

turning on.  ANGLIN instructed him on how to activate it and CS-1 reported VANDIVER used the hair-dryer to dry the cocaine base in conjunction with the microwave.

71.     VANDIVER put a quantity of cocaine on a scale and reported it weighed 1.1 (ounces).  VANDIVER then finished preparing the cocaine base, packaged it, and handed it to CS-1.  CS-1 then provided VANDIVER with $4,900 in documented funds.  The cocaine hydrochloride was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 27.92 grams of cocaine hydrochloride.  The cocaine base was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 108.82 grams of cocaine base.

G.     CS-1 Communication with VANDIVER about NILES being his Source of Supply

72.     CS-1 recorded two FaceTime calls with VANDIVER.  In the calls, VANDIVER reported that NILES was recently arrested and would have to deal with Prince William County and federal probation.  VANDIVER reported that if NILES is arrested that his (VANDIVER's) narcotics distribution would be shut down.  VANDIVER then stated that he wanted to meet NILES' supplier, so he could continue to distribute controlled substance.  VANDIVER and CS-1 discussed pooling their money together in order to purchase a half of a kilogram to one kilogram of cocaine.  VANDIVER further stated that if he and CS-1 can put in $20,000, NILES might put in the remaining $16,000.  VANDIVER discussed obtaining a new phone number because he was worried about federal law enforcement and his connection with gangs.

H.     Arrest of HARDWICK on April 11, 2017 and the Seizure of Controlled Substances, Firearms, and Ammunition

73.     ATF agents learned that HARDWICK was wanted in Prince William County. ATF agents shared HARDWICK's fugitive status with the United States Marshals Service

("USMS") Fugitive Task Force.  The USMS took HARDWICK's case for service of the arrest warrant.

74.    On April 11, 2017, the USMS interviewed a subject leaving the residence on Filarete Street, who confirmed that HARDWICK was in the upstairs master bedroom.  Upon entry into the home, law enforcement smelled an odor of marijuana.  During the protective sweep, it was apparent to law enforcement that HARDWICK was attempting to flush marijuana down the toilet.  A shoebox in the bathtub still contained marijuana, suspected heroin or cocaine, and packaging materials.  Based on the contraband and odor of marijuana identified in plain view, the PWCPD obtained a state search warrant for the residence.  HARDWICK was ultimately arrested on the second floor in a bedroom other than the master bedroom where he stayed.

75.    During the subsequent court-authorized search of the residence, law enforcement seized a Glock .40 caliber pistol with an extended magazine loaded with 16 rounds of .40 caliber ammunition from the water tank of the second floor bathroom toilet.  Based upon my training and experience, I know the Glock .40 caliber pistol to be a firearm as that term is defined under Title 18, United States Code, Section 921(a)(3).  In the bathtub, law enforcement seized a shoebox containing suspected heroin or cocaine.  The suspected heroin or cocaine was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for two (2) grams of fentanyl.  Law enforcement also seized a Glock magazine containing four (4) rounds of .40 caliber ammunition, three additional magazines, inositol, a digital scale, packaging materials, and records and documents for HARDWICK from the master bedroom.  Based on my training and experience in investigating controlled substances, I know inositol to be a common cutting agent that drug dealers use to dilute controlled substances.

26

76.     HARDWICK was the only occupant of the residence located on the second floor. Other residents in the home stated that HARDWICK resided in the master bedroom.  Further, the occupant of the bedroom in which HARDWICK was arrested stated that HARDWICK did not live in that bedroom.

77.     After HARDWICK was advised of his *Miranda* rights and waived those rights, HARDWICK admitted to being a "small time" dealer of heroin.  HARDWICK also admitted that heroin was located in his residence.  HARDWICK initially reported that he had no knowledge of firearms in the residence.  However, when law enforcement challenged HARDWICK, he responded, "Everything in that house is mine, it's easier to say that, is that good enough?" HARDWICK then said, "I'm going to be honest, I want to help myself, everything in the house is mine."

78.     Regarding the Glock pistol, HARDWICK admitted, "I put it in the toilet."  When asked what kind of magazine was in the firearm, HARDWICK replied, "It was an extended magazine."  HARDWICK admitted he purchased the firearm from someone for $500. HARDWICK initially reported the firearm was for home and family protection, but later admitted, "Somebody could have robbed me and I would have shot their ass."  HARDWICK admitted he flushed heroin and marijuana and that he had planned to flush the rest of the drugs in the shoebox.  He reported none of the drugs was cocaine, which is consistent with subsequent lab analysis.

I.     Controlled Purchase of Heroin from JERRY MCCALLISTER on April 25, 2017

79.     In the days leading up to April 25, 2017, CS-1, at law enforcement direction, contacted VANDIVER and arranged to purchase two (2) ounces of cocaine base and one (1) ounce of powder cocaine.  Prior to the transaction, VANDIVER reported to CS-1 that he was

27

"dry" (out of cocaine). CS-1 also discussed purchasing heroin through VANDIVER and NILES. CS-1 met VANDIVER at a location in the Eastern District of Virginia.

80.     After meeting with VANDIVER, CS-1 attempted to purchase heroin through another co-conspirator. However, this co-conspirator was out of the area. CS-1 asked VANDIVER to call NILES to see if he (NILES) could facilitate a heroin transaction. In CS-1's presence, VANDIVER called NILES via FaceTime and asked him if he could assist in obtaining heroin for them. They agreed to meet at a location in Prince William County. VANDIVER and CS-1 rented a hotel room and then waited in VANDIVER's vehicle in the parking lot. A short time later, NILES was observed pulling into the same parking lot in Subject Vehicle 1.

81.     NILES told VANDIVER and CS-1 that he would help them out this one time, but that they would need to purchase heroin directly from the heroin source in the future. A short time later, JERRY MCALLISTER (also known as "Face") arrived in a vehicle. This vehicle is registered in MCALLISTER's wife's name. Law enforcement obtained a photograph of JERRY MCALLISTER and later showed CS-1. CS-1 confirmed MCALLISTER was the heroin source of supply at the deal. CS-1, VANDIVER, NILES, and MCALLISTER all exited their vehicles and entered the hotel.

82.     After introductions were made, CS-1 exchanged phone numbers with MCALLISTER. CS-1 then provided MCALLISTER with $6,900 and purchased approximately 79 grams of heroin.

83.     When CS-1 and VANDIVER returned to VANDIVER's vehicle, VANDIVER informed CS-1 that NILES would want to know the quality of the heroin, because he is giving MCCALLISTER "bricks" (kilograms) of cocaine. VANDIVER further stated that NILES liked to see them succeed. VANDIVER reported NILES will look out for them and if

MCCALLISTER provided them poor quality heroin then VANDIVER and CS-1 could go above MCCALLISTER.

84.     The suspected heroin was later submitted to the DEA Mid-Atlantic Laboratory and tested positive for 75.17 grams of a mixture containing heroin and fentanyl.

J.     Controlled Purchase of Heroin from MCCALLISTER on May 2, 2017

85.     On May 2, 2017, CS-1, at law enforcement direction, contacted MCCALLISTER and ordered three (3) ounces of heroin. MCALLISTER instructed CS-1 to meet him on South Pickett Street in Alexandria, Virginia, which is located within the Eastern District of Virginia. Law enforcement observed MCCALLISTER arrive in a 2004 Honda Pilot bearing Maryland registration XXX6312 ("Subject Vehicle 2"). Subject Vehicle 2 is also registered to MCALLISTER's wife. MCCALLISTER parked and then entered CS-1's vehicle. MCCALLISTER pulled out a bag of suspected heroin and stated it was three (3) ounces and then handed it to CS-1. CS-1 then paid $6,900 in documented funds to MCCALLISTER. The suspected heroin was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 86.40 grams of heroin.

K.     Controlled Purchase of Cocaine Base from VANDIVER on May 4, 2017

86.     On May 4, 2017, CS-1, at law enforcement direction, contacted VANDIVER and ordered three (3) ounces of cocaine base. VANDIVER asked CS-1 to meet him at a restaurant located at Daniel Stuart Square in Woodbridge. Upon arriving, VANDIVER entered CS-1's vehicle and VANDIVER then called PETERSON. VANDIVER informed PETERSON that he was waiting for the mother of one of his children to come home, so he (VANDIVER) could retrieve something from her residence. VANDIVER then exited CS-1's vehicle and instructed

CS-1 to follow him. Law enforcement followed VANDIVER and CS-1 to Lost Canyon Court in Woodbridge, Virginia. Upon arriving, VANDIVER parked his vehicle and then entered CS-1's vehicle.

87.     While in CS-1's vehicle, VANDIVER can be heard communicating with CAREW. CAREW was angry with an individual and can be heard stating that he was going to "beat his ass" or "shoot his shit up" if he wanted to take it there. CAREW then displayed a firearm to VANDIVER and offered to sell it to him for $250. VANDIVER asked if it was clean and CAREW responded he had "never done nothing with it." VANDIVER agreed to purchase it.

88.     Based on my review of CAREW's criminal history, I have determined that CAREW has been convicted of multiple offenses in the Commonwealth of Virginia, which exposed him to more than one year of incarceration, including a conviction in Prince William County Circuit Court of possession of a firearm by a convicted felon, in violation of Code of Virginia § 18.2-308.2. CAREW is therefore prohibited from possessing firearms under federal law.

89.     VANDIVER then placed a phone call to an individual ("Individual 5"). VANDIVER stated, "I know you saw me leave that shit there" and asked how long before Individual 5 got back. A short time later, VANDIVER is observed entering Individual 5's residence located at on Lost Canyon Court, Woodbridge, Virginia. Law enforcement observed VANDIVER exit the residence a short time later holding his genitals (drugs attached to his scrotum). According to CS-1, VANDIVER often conceals drugs in his genital area. Also, according to CS-1, VANDIVER retrieved several ounces of cocaine from Individual 5's apartment. VANDIVER and Individual 5 are reported to have children in common.

30

90.     As VANDIVER and CS-1 drove away from Lost Canyon Court towards Co-Conspirator 2's apartment in Bayside Apartments, VANDIVER received a phone call from Co-Conspirator 3.  Co-Conspirator 3 told VANDIVER that he did not want to drive into Bayside Apartments.  Law enforcement followed VANDIVER and CS-1 to Co-Conspirator 2's apartment on Bayside Avenue.  VANDIVER and CS-1 entered the apartment and PETERSON and his (Peterson's) girlfriend were already inside.

91.     VANDIVER then asked PETERSON if he could take something over to his man. VANDIVER explained his man (Co-Conspirator 3) did not want to drive into Bayview Apartments.  CS-1 stated that VANDIVER provided PETERSON with one (1) ounce of cocaine to deliver to Co-Conspirator 3.  This information is corroborated by toll records, which show that VANDIVER's known phone was in communication with Co-Conspirator 3.  In addition, CS-1 was able to record the bag on top of a digital scale prior to PETERSON retrieving the bag.  The bag weighed 32.6 grams.

92.     After this, VANDIVER began manufacturing cocaine base while inside the apartment.  VANDIVER continued to speak with CS-1 and PETERSON.  PETERSON's girlfriend was also in the apartment while VANDIVER was manufacturing cocaine base. PETERSON then left the apartment with his girlfriend.  A short time later, they returned to the apartment.  When PETERSON returned, CS-1 reported PETERSON purchased approximately four (4) grams of cocaine from VANDIVER for $100 in CS-1 presence.  PETERSON and his girlfriend left and were observed driving away in his girlfriend's vehicle shortly thereafter.

93.     After completing the manufacture of cocaine into cocaine base, VANDIVER provided CS-1 with approximately 187 grams of cocaine base.  In return, CS-1 paid VANDIVER $5,400 in documented funds.  CS-1 then drove VANDIVER back to Lost Canyon Court.  The

31

suspected cocaine base was submitted to the DEA Mid-Atlantic Laboratory and tested positive

for 185.10 grams of cocaine base.

      L.      Controlled Purchase of a Firearm and Cocaine from VANDIVER on May 9, 2017

      94.      In the days leading up to this date, VANDIVER contacted CS-1 and asked CS-1 if

he wanted to purchase the firearm that CAREW and VANDIVER discussed on May 4, 2017.

CS-1 agreed to purchase the firearm along with one (1) ounce of cocaine. VANDIVER

instructed CS-1 to come to Co-Conspirator 2's apartment on Bayside Avenue, where CS-1 met

VANDIVER.

      95.      Law enforcement followed CS-1 and VANDIVER as VANDIVER drove away in

his vehicle. VANDIVER reported to CS-1 that he had just purchased a "28," a "62," and a

quantity of "hard." In my training and experience, these are common gram quantities of cocaine

and hard is a slang term for cocaine base. VANDIVER and CS-1 then returned to Co-

Conspirator 2's apartment on Bayside Avenue shortly after they left.

      96.      Inside the apartment, CS-1 sat on a chair in the living room and VANDIVER

asked him if he could feel anything in it. CS-1 shifted his bodyweight and felt something inside

the cushion. VANDIVER explained that if law enforcement ever found the drugs hidden inside

the pillow, he (VANDIVER) did not live there and would contest his possession. CS-1 also

reported that VANDIVER cut out a portion of foam inside one of the cushions and inside there

was a "four deuce" or 4.5 ounces of cocaine inside clear plastic bags (126 grams).

      97.      VANDIVER informed CS-1 that one ounce of cocaine would cost $1,400.

VANDIVER then took out 4.5 ounces of cocaine and placed it on the dining room table.

VANDIVER scooped out cocaine and packaged it for CS-1. VANDIVER reported he was

trying to make a $300 profit from the firearm CS-1 was going to purchase. CS-1 handed

VANDIVER $2,000 in documented funds and received the ounce of cocaine.

98.     VANDIVER and CS-1 then left Co-Conspirator 2's Bayside Avenue apartment

and travelled to an apartment on Lost Canyon Court, Woodbridge. Law enforcement observed

VANDIVER enter Individual 5's apartment without CS-1 and return a short time later and

subsequently open and close the trunk of his vehicle. CS-1 later informed law enforcement that

VANDIVER took the remainder of the "four deuce" from the Bayside Avenue apartment and left

it inside Individual 5's residence. VANDIVER then reentered his vehicle carrying a white towel,

which covered the firearm. VANDIVER reported the firearm was rusty, but he had cleaned it.

VANDIVER wiped down the firearm, and then handed it to CS-1 to inspect. VANDIVER took

the firearm back, wrapped it back up in the towel, and placed it on the driver's seat between his

leg and center console. Law enforcement then followed VANDIVER and CS-1 back to Co-

Conspirator 2's Bayside Avenue apartment parking lot. CS-1 then returned to his vehicle and

drove to meet law enforcement.

99.     CS-1 provided law enforcement with the firearm and suspected cocaine. The

firearm is a Smith & Wesson .40 caliber pistol. Based upon my training and experience, I know

the Smith & Wesson pistol to be a firearm as that term is defined under Title 18, United States

Code, Section 921 (a)(3). The suspected cocaine was submitted to the DEA Mid-Atlantic

Laboratory and tested positive for 27.98 grams of cocaine hydrochloride.

M.     Controlled Purchase of a Cocaine Base from PETERSON on May 10, 2017

100.     On May 10, 2017, CS-1, at law enforcement direction, provided PETERSON with

the phone numbers of two cooperating sources. CS-1 informed PETERSON that the two

cooperating sources were former customers of CS-1, who moved to PETERSON's area.

33

101.    CS-2 has been convicted of felony possession of a schedule I/II substance in the Commonwealth of Virginia.  CS-2 began working with ATF in 2002 and works for compensation.  CS-3 has been convicted felony possession of cocaine in the Commonwealth of Virginia.  CS-3 began working with ATF in 2015 and works for compensation.  CS-4 has been convicted of four felony convictions in the Commonwealth of Virginia to include Possession of Cocaine, Forgery, and Distribution of Cocaine.  CS-4's last felony conviction was in 1997.  CS-4 began working with ATF in 2015 and works for compensation.  CS-2 died unexpectedly during the week of November 13, 2017.  All of CS-2's controlled purchases were audio and video recorded.  Further, law enforcement conducted surveillance of the deals.  Further, for all of CS-2's deals another cooperating source was also present.

102.    On May 8, 2017, PETERSON called CS-2 and introduced himself to CS-2.  CS-2 ordered one-half (1/2) ounce of cocaine base and agreed to a price of $950.  On May 10, 2017, PETERSON instructed CS-2 to meet him near the Hidden Valley trailer park in Stafford, Virginia, within the Eastern District of Virginia.  CS-2, CS-3 and CS-4 drove to a 7-Eleven located at 3623 Jefferson Davis Highway, Stafford, Virginia, and CS-2 informed PETERSON they had arrived.  A short time later, PETERSON was observed arriving as a passenger in his girlfriend's vehicle.  His girlfriend parked and PETERSON then entered CS-2's vehicle (CS-3 and CS-4 were also in the vehicle).  PETERSON pulled out a bag of suspected cocaine base and CS-2 in return paid $950 in documented funds to PETERSON.  The suspected cocaine base was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 14.58 grams of cocaine base.

34

N.   Controlled Purchase of Cocaine Base from PETERSON on May 17, 2017

103.   On May 15, 2017, CS-2, at law enforcement direction, contacted PETERSON and ordered one-half (1/2) ounce of cocaine base.  PETERSON told CS-2 it would be the same price as the previous deal.  CS-2 reminded PETERSON that he offered to lower the price next time.  PETERSON then agreed to sell the cocaine for $850.  CS-2 informed PETERSON that CS-3 and CS-4 also wanted to purchase one-half (1/2) ounce of cocaine base.  CS-2 and PETERSON agreed to meet at the 7-Eleven located at 3623 Jefferson Davis Highway for the purchase of a combined total of one ounce of cocaine base.

104.   CS-2, CS-3 and CS-4 arrived at the meeting location and contacted PETERSON, who advised that he would arrive shortly.  Law enforcement observed a known individual ("Individual 6") pickup PETERSON at his residence.  Law enforcement then observed PETERSON place a blue bag in the trunk and another bag in the rear seat.

105.   Law enforcement followed PETERSON and Individual 6 to the meeting location.  Upon arriving, PETERSON entered CS-2's vehicle (CS-3 and CS-4 was also present).  CS-2 provided PETERSON with $1,700 in documented funds for CS-2's half-ounce (1/2) and CS-3 and CS-4's half-ounce (1/2) of cocaine base.  CS-4 asked PETERSON what the price break would be if he purchased an ounce of cocaine base and PETERSON responded that the price would be $1,300.  The suspected cocaine base purchased by CS-2, CS-3 and CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 25.75 grams of cocaine base.

O.   Controlled Purchase of Cocaine Base from PETERSON on May 24, 2017

106.   On May 24, 2017, CS-4, at law enforcement direction, contacted PETERSON and ordered one and one half (1.5) ounces of cocaine base.  PETERSON initially stated he would sell the cocaine for $1,500; however, CS-4 negotiated the price to $1,300 for the ounce and $750 for

35

enforcement observed these individuals coming in and out of the building using a surveillance camera.

110. At the meeting location, PETERSON exited his girlfriend's vehicle and entered CS-4's vehicle. PETERSON provided CS-4 with a bag containing cocaine base and CS-4 provided PETERSON with $2,000. During the transaction, law enforcement observed Co-Conspirator 3 arrive in the same parking lot. CS-4 commented to PETERSON that Co-Conspirator 3 was looking at him counting the money but PETERSON was not concerned.

111. Law enforcement then observed PETERSON meet with Co-Conspirator 3 and conduct what appeared to be another drug transaction. PETERSON then walked to his girlfriend's vehicle, while Co-Conspirator 3 went to a third party's vehicle and conducted what appeared to be a drug transaction. Co-Conspirator 3 walked away from the third party's vehicle and back to the driver's side of PETERSON's girlfriend's vehicle. PETERSON's toll records show him in communication with VANDIVER and Co-Conspirator 3 during this encounter.

112. CS-4 departed with the purchased cocaine base. The suspected cocaine base purchased by CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 41.97 grams of cocaine base.

R. IGB Gang Meeting on May 13, 2017

113. CS-1 was debriefed about a gang meeting that took place in Norfolk, Virginia. CS-1 reported that IGB members discussed an attempted armed home invasion in Woodbridge, Virginia. According to CS-1, VANDIVER directed members to conduct an armed home invasion of a rival gang member that was alleged to have a large sum of U.S. currency. The IGB gang members were armed with a Draco pistol and observed the intended target inside of his

37

residence. Two of the three gang members decided not to participate and the robbery was called off.

114.    During the meeting, CS-1 learned from other IGB members that MCCALLISTER opened a carpet cleaning business. MCCALLISTER was reported to be supplied heroin by MARK KETTER (also known as "Tana," also known as "VA Tana") ("KETTER").

S.    Controlled Purchase of Cocaine Base from PETERSON on June 16, 2017

115.    On June 13, 2017, a cooperating source ("CS-4") contacted PETERSON and ordered two (2) ounces of cocaine base, one for CS-2 and one for CS-4. PETERSON agreed to sell the cocaine base for $1,350 per ounce.

116.    On June 16, 2017, CS-4 contacted PETERSON, who instructed CS-2 and CS-4 to meet him in Dumfries, Virginia. Law enforcement surveillance observed PETERSON's girlfriend pick up PETERSON at his residence in her vehicle.

117.    Prior to the transaction, law enforcement observed PETERSON and his girlfriend at a residence located on Point Pleasant Lane, Dumfries, Virginia. At that time, PETERSON's toll records show him in communication with VANDIVER. VANDIVER is also known to frequent the address on Point Pleasant Lane. PETERSON and his girlfriend left the residence and traveled to the meeting location.

118.    At the meeting location, PETERSON exited his girlfriend's vehicle and met with CS-2 and CS-4. PETERSON provided the bag containing two (2) ounces of cocaine base to CS-4, who in return provided PETERSON with $2,700 in documented funds. The suspected cocaine base purchased by CS-4 and CS-2 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 55.35 grams of cocaine base.

T.    CS-1 and VANDIVER Discuss IGB Interstate Drug Trafficking Network on June 17, 2017

119.    At law enforcement direction, CS-1 met with VANDIVER and traveled in his vehicle to a restaurant in Woodbridge. VANDIVER and CS-1 met with Unnamed IGB Member 4, who holds the rank of World Wide High (top leadership tier within IGB). VANDIVER proposed that he (VANDIVER), CS-1, and Unnamed IGB Member 4 pool $10,000 per person as seed money to fund a large purchase of cocaine and marijuana. VANDIVER further proposed they organize a "money team" of the top five performers within each city where the IGB have a presence.

U.    Controlled Purchase of Cocaine Base from PETERSON on June 22, 2017

120.    On June 20, 2017, CS-2 contacted PETERSON and ordered two (2) ounces of cocaine base. PETERSON agreed to meet CS-2 on June 22 at the same location in Triangle. CS-2 and CS-3 arrived at the meeting location, CS-2 received a text message from PETERSON stating, "I'm cooking now" (manufacturing cocaine base). When CS-2 asked how long PETERSON would be, PETERSON reported, "At least 30 just got it."

121.    Law enforcement located vehicles associated with PETERSON and VANDIVER outside of Co-Conspirator 2's Bayside Avenue Apartment in Woodbridge. Law enforcement observed VANDIVER and PETERSON exit the apartment building together and then enter VANDIVER's vehicle. Shortly thereafter, VANDIVER's vehicle arrived at the meeting location. PETERSON exited VANDIVER's vehicle and then entered CS-2's vehicle (CS-3 was also in the vehicle). PETERSON provided CS-2 with a bag containing two (2) ounces of cocaine base and in return CS-2 provided him with $2,700 in documented funds. After the transaction, PETERSON reentered VANDIVER's vehicle and departed the area. The suspected cocaine base

39

purchased by CS-2 and CS-3 had a positive field test and has been submitted to the DEA Mid Atlantic Laboratory for testing.

### V.    CS-1 and VANDIVER Discuss PETERSON Manufacturing Cocaine Base on June 27, 2017

122.    On June 27, 2017, CS-1 recorded a conversation with VANDIVER in which VANDIVER discussed PETERSON manufacturing cocaine base. VANDIVER reported PETERSON had purchased one-half (1/2) ounce of cocaine from him. PETERSON later called VANDIVER and asked for help manufacturing cocaine base. VANDIVER told PETERSON he was unavailable to cook the cocaine base, so PETERSON attempted to do it himself. VANDIVER found it amusing because PETERSON contacted him via FaceTime and he had an excessive amount of water in the cocaine mixture. VANDIVER further reported PETERSON had a crack smoker there helping him cook. VANDIVER said PETERSON had boiled the cocaine and messed up the process badly.

### W.    PETERSON involved in a shooting in Stafford County, Virginia

123.    On July 5, 2017, a shooting was reported to the Stafford County Sheriff's Office ("SCSO"). The initial investigation revealed PETERSON, his girlfriend, and Individual 6 had a dispute with a rival group of individuals that culminated in a shootout. During the exchange of gunfire, Individual 6 was shot in the lower body.

124.    Law enforcement had placed a surveillance camera on PETERSON's apartment building prior to this incident. At approximately 1:17 a.m., PETERSON and his girlfriend can be observed running towards PETERSON's apartment building on Garrison Woods Drive, Stafford, Virginia. PETERSON was observed stepping out to the front porch and looking around the corner. At one point in the video, PETERSON is observed raising a firearm and firing two to

three rounds at individuals in the parking lot. Those individuals took cover in between parked cars. PETERSON is then observed picking up items believed to be casings or shells from the ground.

X.      CS-1 met with VANDIVER and Unnamed IGB Member 5 on July 25, 2017

125.    On July 25, 2017, law enforcement followed CS-1, who was acting at law enforcement direction, and observed CS-1 pickup a co-conspirator ("Co-Conspirator 4") and drive to Lost Canyon Court to meet VANDIVER. When they arrived, CS-1 and Co-Conspirator 4 entered VANDIVER's vehicle and drove to 15144 Cloverdale Road, Woodbridge, Virginia 22193. After several hours, the group traveled to an apartment located on Berlin Court in Woodbridge. The group then travelled to an apartment on Lost Canyon Court, Woodbridge, Virginia. CS-1 learned that this location was ANGLIN's new residence. Similar to ANGLIN's Bellona Road apartment, while inside ANGLIN's new apartment, VANDIVER manufactured cocaine base. Upon finishing the manufacture, law enforcement followed VANDIVER to a gas station on Annapolis Way in Woodbridge, where VANDIVER sold the quantity of cocaine base to EDLER. After the transaction, law enforcement followed VANDIVER back to 15144 Cloverdale Road.

Y.      Controlled Purchase of Cocaine Base from PETERSON on July 26, 2017

126.    On July 24, 2017, CS-4 ordered one (1) ounce of cocaine base from PETERSON. PETERSON agreed to meet at the same location in Triangle, Virginia, on July 26.

127.    After confirming CS-4 was on site, law enforcement observed VANDIVER's vehicle pull into the parking lot. PETERSON exited VANDIVER's vehicle and entered CS-4's vehicle. PETERSON provided CS-4 with a bag containing one (1) ounce of cocaine base. CS-4 paid PETERSON with $1,300 in documented funds. After the transaction, PETERSON

41

reentered VANDIVER's vehicle and departed the area. The suspected cocaine base purchased by CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 27.40 grams of cocaine base.

    Z.    <u>Controlled Purchase of Two Firearms from VANDIVER on July 27, 2017</u>

    128.    On July 27, 2017, VANDIVER sent CS-1 a photograph of two firearms and reported they were for sale. CS-1 agreed to purchase the firearms and coordinated a purchase of marijuana via VANDIVER. VANDIVER directed CS-1 to 15144 Cloverdale Road, Woodbridge, Virginia. Law enforcement observed VANDIVER at the residence via a law enforcement surveillance camera positioned on the home. CS-1 drove to the residence. Upon entering the residence, CS-1 met and spoke with VANDIVER and Co-Conspirator 4.

    129.    Inside a screened in area in the rear of the residence, VANDIVER informed CS-1 that one of the firearms could use a suppressor. VANDIVER also discussed large capacity magazines. Via CS-1's audio recording/transmitting equipment, law enforcement heard firearms being manipulated. CS-1 later reported Co-Conspirator 4 who is also prohibited from possessing firearms due to felony convictions held one of the firearms and manipulated the firearm. VANDIVER reported one of the firearms had a lot of kick and told CS-1 to hold it in his body.

    130.    During the transaction, VANDIVER reached into a white container with a twist off lid located next to the couch in the same area, and obtained what appeared to be an "8-ball" (3.5 grams) of cocaine. CS-1 provided VANDIVER with $1,300 in documented funds for the firearms and placed them in a shoebox. Prior to departing, CS-1 placed the shoebox containing the firearms in the trunk of VANDIVER's vehicle for security.

    131.    VANDIVER, Co-Conspirator 4, and CS-1 departed the residence in CS-1's vehicle. Law enforcement followed the vehicle to the Tanger Outlets located in National Harbor,

42

Maryland. VANDIVER discussed his hatred of corrections officers, and how he would place a tracker underneath an officer's vehicle, follow them around for a month, and eventually kill the officer. This was general conversation and no specific threat was made.

132.    Once in the area of the Tanger Outlets, VANDIVER received a call and informed the caller of his location in the parking lot near the Ralph Lauren store. Law enforcement observed CAREW arriving to the parking lot in a Mercedes SUV bearing Ohio registration XXX-7303. CS-1 paid VANDIVER $2,800 per pound of marijuana and ordered three pounds. CAREW charged $2,700 per pound and VANDIVER charged a $100 per pound tax for the introduction to CAREW according to CS-1. CS-1 provided VANDIVER with $8,400 in documented funds. VANDIVER exited CS-1's vehicle and entered CAREW's vehicle. CS-1 and Co-Conspirator 4 drove behind CAREW to the Sunoco gas station in National Harbor. Shortly thereafter, VANDIVER entered CS-1's vehicle and departed the area.

133.    The group returned to 15144 Cloverdale Road, where CS-1 retrieved the purchased firearms from VANDIVER's trunk and departed the residence with the marijuana and firearms. VANDIVER and Co-Conspirator 4 were observed entering the residence carrying a bag.

134.    CS-1 was followed to a meeting location where the marijuana and firearms were collected by law enforcement. The suspected marijuana purchased by CS-1 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 1,266.9 grams of marijuana. The firearms purchased were a Velocity, LLC model VMAC45, .45 caliber pistol and a Glock model 21, .45 caliber pistol. Based upon my training and experience, I know these pistols to be firearms as that term is defined under Title 18, United States Code, Section 921(a)(3).

AA.   Arrest of PETERSON on July 28, 2017

135.   On July 28, 2017, the SCSO obtained an arrest warrant for PETERSON. The charges were related to the July 5, 2017 shooting incident described above in which PETERSON was observed by law enforcement firing a shotgun at a rival group. Warrants for possession of a firearm by a convicted felon, use of a firearm in commission of a felony, reckless handling of a firearm, and discharging a firearm within or at a building occupied by one or more persons were obtained.

136.   On or about July 13, 2017, CS-1 reported to law enforcement that PETERSON had obtained a Glock pistol from VANDIVER's brother, a known gang member. PETERSON had also told CS-1 that he planned to keep the Glock pistol on him at all times. Law enforcement expected PETERSON to be armed, when they observed him exit his residence. When detectives approached PETERSON, he fled on foot into the nearby wood line. A law enforcement K-9 unit tracked PETERSON and he was ultimately arrested in a neighboring residential area.

137.   In addition to the arrest warrants, the SCSO also obtained a search warrant for PETERSON's residence. During the court-authorized search, law enforcement seized an extended magazine with .40 caliber ammunition, a plastic bag containing a substance consistent with cocaine, and a long gun case.

138.   In a monitored telephone call at the Rappahannock Regional Jail, PETERSON contacted VANDIVER and informed him that law enforcement had not found a firearm.

139.   On August 1, 2017, an ATF explosives detection K-9 was summoned to the area to conduct a search in the wooded area where PETERSON had fled. The ATF K-9 and her handler located a Glock model 22, .40 caliber pistol with a laser sight attached in the woods.

44

The firearm was unloaded and without a magazine. The magazine and ammunition found in

PETERSON's residence could be used with this firearm. Based upon my training and

experience, I know the Glock pistol to be firearm as that term is defined under Title 18, United

States Code, Section 921 (a)(3).

BB.   CS-1 Purchases an AK-47 Rifle from TYUS TERRELL on August 1, 2017

140.   On July 29, 2017, VANDIVER sent a photograph of an unidentified AK-47 rifle

with a high-capacity drum magazine to CS-1. CS-1 agreed to purchase the firearm on August 1,

2017. On that date, VANDIVER instructed CS-1 to meet him at Potomac Mills Mall. Law

enforcement located VANDIVER with a known individual ("Individual 7"). CS-1 met up with

them and VANDIVER instructed him to follow in his vehicle.

141.   While driving, VANDIVER contacted CS-1 via FaceTime and told him they

would be going to a location off Birchdale Avenue. While Individual 7 remained in the parking

lot, VANDIVER led CS-1 to a residence on Belvedere Drive in Woodbridge where he

(VANDIVER) and CS-1 entered the residence. Inside the residence, CS-1 reported the AK-47

was leaning against a piece of furniture in the kitchen. VANDIVER introduced CS-1 to "TAZ"

(known to law enforcement as TYUS TERRELL ("TERRELL")). CS-1 informed law

enforcement that TERRELL is a "minion" or subordinate of JOHNSON. JOHNSON is a Milla

Time Blood and the reported regional leader of the gang. TERRELL is a Family over

Everything (FOE) gang member as well.

142.   CS-1 provided $300 in documented funds to VANDIVER inside the kitchen as a

tax for setting up the transaction. CS-1 then placed the $1,300 in documented funds on the

kitchen table to purchase the AK-47. TERRELL collected the money and then provided CS-1

with the high-capacity drum magazine for the rifle. The rifle is an Inter Ordnance Incorporated

AK-47-C, 7.62x39 caliber rifle. An NCIC query of the firearm also revealed the firearm was reported stolen from Stafford County, Virginia.

143.     Based upon my training and experience, I know the Inter Ordnance Incorporated rifle to be a firearm as that term is defined under Title 18, United States Code, Section 921 (a)(3). Further, this firearm is not manufactured in the Commonwealth of Virginia; consequently, any Inter Ordnance Incorporated rifle found in the Commonwealth of Virginia have traveled in interstate and/or foreign commerce from their point of manufacture outside of the Commonwealth of Virginia into the Commonwealth of Virginia.

144.     After the identification of TERRELL's alias as "Taz," law enforcement recalled the purchase of a firearm on March 23, 2017 from a "Taz," who was unidentified at the time. Upon reviewing information from that date, law enforcement determined the firearm was purchased from TERRELL then as well. On that date, TERRELL sold a Hi-Point model C9 9mm pistol in Woodbridge, Virginia to a cooperation source ("CS-5"). CS-5 provided law enforcement with TAZ's social media account at the time, which law enforcement used to positively identify TERRELL in August, 2017.

CC.     Arrest of TERRELL on August 3, 2017

145.     After the above transaction, law enforcement learned TERRELL was wanted in Spotsylvania County, Virginia. Law enforcement established surveillance on a location located on Belvedere Drive, and later followed TERRELL after he left the residence. The PWCPD stopped TERRELL's vehicle. TERRELL was arrested from the front passenger seat of the vehicle.

146.     Law enforcement seized a Glock model 26, 9mm pistol with an extended magazine from the map pocket of TERRELL's door. Law enforcement also seized suspected

cocaine from the driver's possession. Based upon this search, the PWCPD obtained a search warrant for the residence on Belvedere Drive.

147.    During the court-authorized search of TERRELL's residence, law enforcement seized documented cashier funds used by CS-1 to purchase the AK-47 on August 1, 2017, among other evidence.

148.    Law enforcement later obtained a search warrant for TERRELL's social media accounts. In the social media returns, law enforcement determined that TERRELL's account includes photographs of not only the AK-47, but of firearms purchased by law enforcement from VANDIVER on July 27, 2017. Based on these photographs, I submit that there is probable cause to support that TERRELL was the source of the firearms for the deal on July 27, 2017, as well.

149.    Based on a review of TERRELL's criminal history, I have determined that TERRELL has been convicted of multiple offenses in the Commonwealth of Virginia, which exposed him to more than one year of incarceration, including a conviction in Spotsylvania County Circuit Court of possession with intent to distribute marijuana, in violation of Code of Virginia § 18.2-248.1 and Obstruction of Justice, in violation of Code of Virginia § 18.2-460. TERRELL is therefore prohibited from possessing firearms under federal law.

DD.    Rank Structure of the Regional IGB Changes

150.    On August 3, 2017, CS-1 received a text message from Co-Conspirator 4 with the new "line-up" (rank structure) for the IGB in Northern Virginia. Co-Conspirator 4 reported VANDIVER was the HIGH 020. Co-Conspirator 4 is now a Five Star General, CS-1 is a Four Star General, and another co-conspirator is now a Three Star General.

47

EE.    VANDIVER buys Marijuana from CAREW for LEDERER on August 8, 2017

151.    On August 8, 2017, CS-1, at law enforcement direction, met with VANDIVER at Potomac Mills Mall. CS-1 entered VANDIVER's vehicle and they then both drove to 15144 Cloverdale Road. VANDIVER and CS-1 later traveled to an area restaurant and met Co-Conspirator 4. VANDIVER, CS-1, and Co-Conspirator 4 then drove to 1928 Coppersmith Terrace, Woodbridge, Virginia to meet CAREW. VANDIVER exited the vehicle and went to meet CAREW. VANDIVER returned with a plastic bag that contained approximately one-quarter (1/4) pound of marijuana.

152.    VANDIVER, CS-1, and Co-Conspirator 4 then drove to an apartment complex near Birchdale Avenue and VANDIVER exited the vehicle. CS-1 reported VANDIVER left with the bag of marijuana, met with LEDERER, and returned to the vehicle with money.

153.    VANDIVER, CS-1, and Co-Conspirator 4 then drove back to 1928 Coppersmith Terrace and VANDIVER reported CAREW had just received 100 pounds of marijuana. VANDIVER further reported he wanted to switch out an old pound of marijuana with a fresh pound. Once at the residence, VANDIVER retrieved a bag of marijuana from his trunk and walked over to NATHANIEL BRUCE-COBBOLD ("BRUCE-COBBOLD") (also known as Cedis) a known co-conspirator of CAREW. BRUCE-COBBOLD was sitting inside an Audi vehicle registered in his name. VANDIVER handed BRUCE-COBBOLD the old pound of marijuana and in return BRUCE-COBBOLD handed him the new pound. VANDIVER then placed the new pound of marijuana into his trunk.

FF.    Controlled Purchase of Cocaine Base from EDLER on August 11, 2017

154.    On August 10, 2017, CS-1 and VANDIVER discussed CS-4. CS-4 was purchasing from PETERSON prior to his arrest. VANDIVER asked CS-1 if CS-4 had EDLER's

48

telephone number. CS-1 reported that he did and asked VANDIVER if he wanted CS-1 to

"coach" EDLER on how to sell the cocaine base. VANDIVER reported he had already coached

him. VANDIVER told CS-1 to inform CS-4 that he would sell them two (2) ounces of cocaine

base. VANDIVER further stated that he had five (5) ounces of cocaine on him and he could

manufacture ten (10) ounces of cocaine base. He would charge CS-4 $1,800 per ounce and they

could have as much as they wanted. VANDIVER reported he did not want to sell to CS-4

directly and he would get someone to sell it to them.

155.     On the same date, VANDIVER, CS-1, and EDLER held a three-way recorded

phone call in which VANDIVER instructed EDLER to sell two (2) ounces of cocaine base to

CS-4. VANDIVER asked EDLER if he was "equipped" to do the transaction, to which EDLER

replied he was. VANDIVER stated he would pay EDLER $200 for selling the cocaine base.

156.     A three-way recorded phone call between CS-1, CS-4, and EDLER then took

place and EDLER instructed CS-4 to meet him in Fredericksburg, Virginia.

157.     On August 11, 2017, EDLER contacted CS-4 via text message and stated, "Meet

somewhere on 3," referencing Route 3 in Fredericksburg. CS-4 and EDLER agreed to meet in

the parking lot of a restaurant on Plank Road, Fredericksburg. EDLER arrived in a gold Honda

Civic. CS-4 entered EDLER's vehicle and provided EDLER with $3,600 in documented funds

for two (2) ounces of cocaine base. EDLER in return provided the cocaine base. CS-4 asked if

the price would be different in the future and EDLER reported it would be less. The suspected

cocaine base purchased by CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested

positive for 54.13 grams of cocaine base.

49

GG.    Controlled Purchase of Cocaine Base from EDLER on August 17, 2017

158.    On August 17, 2017, CS-1 advised law enforcement that EDLER contacted him and stated he was unable to get ahold of VANDIVER and that he was concerned because he had arranged to sell three (3) ounces of cocaine base to CS-4. CS-1 contacted VANDIVER after this conversation via FaceTime and VANDIVER reported he had talked to EDLER and told him, "Bro, if you don't want to do it, just let me know." VANDIVER then said he did not hear back from EDLER. VANDIVER stated he would call EDLER and if everything was good, VANDIVER would "whip it" (manufacture cocaine base) and drive there to meet him. CS-1 reported he would go meet VANDIVER shortly and ride with him.

159.    CS-1 met up with VANDIVER and they drove to a residence of a female acquaintance of VANDIVER located on Wakewater Way, Woodbridge, Virginia. CS-1 was able to obtain a phone number for the female acquaintance and VANDIVER's toll records show him communicating with the number on the same date. While inside the residence, VANDIVER was captured by CS-1 holding a black pistol with a flashlight, and a suppressor attached along with a black cable. VANDIVER was reported to be on a FaceTime call at the time, CS-1 believed he was talking to NILES. VANDIVER informed CS-1 that he had purchased the firearm a month prior from EDLER for $350. VANDIVER further reported he had obtained the suppressor from Amazon and that it was not a real suppressor. Moreover, during this investigation law enforcement obtained a search warrant for one of VANDIVER's social media accounts. This same firearm appears in a photo on VANDIVER's social media account on August 17, 2017. In addition, CS-1 captured what appears to be a quantity of cocaine base sitting on a digital scale in front of VANDIVER, while VANDIVER is seen holding the firearm.

50

160.    At law enforcement direction, CS-4 contacted EDLER and ordered three (3) ounces of cocaine base.

161.    VANDIVER and CS-1 remained at the Wakewater residence for a time before departing to deliver cocaine base to EDLER.  VANDIVER and CS-1 drove to a barbershop located on Lafayette Boulevard, Fredericksburg, Virginia.  Law enforcement observed EDLER approach CS-1's vehicle and meet with VANDIVER.  CS-1 stated that VANDIVER provided the cocaine base to EDLER and that they planned to meet up after the sale to CS-4, so EDLER could pay VANDIVER for the cocaine base.

162.    EDLER instructed CS-4 to meet at a restaurant on Plank Road.  At the meeting location, CS-4 entered EDLER's vehicle and provided EDLER with $4,500 in documented funds.  EDLER then handed CS-4 two (2) ounces of cocaine base.  CS-4 reported he was short (supposed to be three ounces) and EDLER reported there was confusion and he only brought two (2) ounces of cocaine base.  EDLER returned $1,500 in documented funds to CS-4.

163.    Law enforcement followed EDLER after the drug transaction to the Spotsylvania Mall.  EDLER was observed meeting with VANDIVER and, according to CS-1, EDLER paid VANDIVER.  The suspected cocaine base purchased by CS-4 was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 52.81 grams of cocaine base.

HH.    Controlled Purchase of Cocaine Base from VANDIVER on August 31, 2017

164.    On August 31, 2017, CS-1, at law enforcement direction, ordered a $15,000 quantity of cocaine base from VANDIVER.  CS-1 placed a recorded FaceTime call to VANDIVER, who instructed him to meet at an apartment on Vantage Drive, Woodbridge, Virginia.  Once there, VANDIVER and a known individual ("Individual 8") entered CS-1's vehicle.  Law enforcement followed the group to the parking lot of ANGLIN's apartment at Lost

51

Canyon Court. VANDIVER exited CS-1's vehicle and, according to CS-1, VANDIVER called

ANGLIN. This was corroborated by VANDIVER's phone records. CS-1 also heard

VANDIVER call someone else and state, "I need 10." VANDIVER's toll records reveal he

contacted ANGLIN and NILES during this timeframe.

165.    Law enforcement observed VANDIVER enter and later exit ANGLIN's residence

on Lost Canyon Court. VANDIVER, CS-1, and Individual 8 were then followed to the area of

Berlin Court, Woodbridge, Virginia. VANDIVER received a phone call and stepped out of the

vehicle. CS-1 reported VANDIVER entered an apartment located on Berlin Court. When

VANDIVER returned, he told CS-1 that he just sold one (1) ounce of cocaine to people inside,

who then added 15 grams of Inositol (a cutting agent), wrapped it in aluminum foil, and baked it

in the oven on low. VANDIVER further reported "JACK" (JOHNSON) was inside. Shortly

thereafter, VANDIVER, CS-1, and Individual 8 departed the area.

166.    Law enforcement observed JOHNSON (also known as "JACK") depart the same

area in a Kia sedan. Law enforcement had observed JOHNSON drive this vehicle on other

occasions. CS-1 later informed law enforcement that the Milla Time Bloods are using the

apartment to manufacture and distribute cocaine base and heroin. Further, JOHNSON is the

head of the Milla Time Bloods.

167.    Law enforcement surveillance was also established on NILES on this date.

NILES was observed in a silver Range Rover at 13715 Lynn Street, Woodbridge, Virginia. Law

enforcement later learned that NILES uses apartment #16 on 13715 Lynn Street.

168.    Meanwhile, at approximately 3:45 p.m., VANDIVER was on the phone

discussing what restaurant in the area of Potomac Mills mall they would like to meet at.

According to toll records, VANDIVER and NILES were in contact. After the phone call,

VANDIVER instructed CS-1 to drive behind the Olive Garden restaurant. At approximately 3:49 p.m., NILES departed the Lynn Street apartments followed by law enforcement. NILES was followed to Potomac Mills Mall where he met up with VANDIVER. A short time later, VANDIVER exited CS-1's vehicle and entered NILES' vehicle. VANDIVER returned to CS-1's vehicle with approximately ten (10) ounces of cocaine.

169.    After the transaction, NILES was followed to 15144 Cloverdale Road, where he entered the residence. NILES then departed the residence and entered a black Ford pickup truck and departed again. Law enforcement then followed NILES to 10532 Cooktown Road, Spotsylvania, Virginia. NILES and the other occupant of the vehicle drove past the residence and into a wood line behind the residence. It appeared to law enforcement that NILES and the other individual were burying something in the wooded area. Law enforcement would also later learn that NILES frequents this residence. However, law enforcement have not surveilled NILES entering the residence; rather, NILES has only been observed entering the wooded area.

170.    Meanwhile, law enforcement continued to follow VANDIVER, CS-1, and Individual 8 as well. The group traveled to a store and CS-1 reported VANDIVER purchased items needed to manufacture cocaine base. The group then traveled to an apartment on Vantage Drive and entered the apartment. Inside the apartment, VANDIVER manufactured the ten (10) ounces of cocaine purchased from NILES into approximately thirteen (13) ounces of cocaine base. CS-1 reported Individual 8 was present during the cooking process, but did not participate.

171.    After preparing the cocaine base, CS-1 and VANDIVER departed the apartment with the cocaine base. They reentered VANDIVER's vehicle and travelled to 15144 Cloverdale Road. VANDIVER traveled to this residence to find a scale that could measure the weight of the cocaine base. VANDIVER took CS-1 to the screened in porch area on the rear of the residence.

VANDIVER then placed the cocaine base onto a scale. Upon reviewing the video recording, the number "381" or "387" was displayed on the LCD screen, which indicates the weight in grams. VANDIVER and CS-1 then returned to the apartment on Vantage Drive. The suspected cocaine base was submitted to the DEA Mid-Atlantic Laboratory and tested positive for 369.89 grams of cocaine base.

II.     VANDIVER Displays New Firearms and Discusses Drug Trafficking with CS-1

172.    On or about September 5, 2017, CS-1 reported VANDIVER had sent him a picture of an AR pistol type firearm with a red paint scheme and images of what appeared to be zombies. The firearm appeared to be loaded and a "SIGHTMARK" red dot or holographic sight was attached to the top rail of the firearm.

173.    On or about September 8, 2017, CS-1 reported VANDIVER was at ANGLIN's residence located on Lost Canyon Court measuring out a "four-deuce" (4.5 ounces) of cocaine on the kitchen counter. CS-1 was able to photograph VANDIVER measuring out the cocaine. CS-1 also took a photograph of a firearm in a box displaying "Smith &Wesson M&P" on it.

JJ.     CS-1 Provides Intelligence on IGB and NILES and VANDIVER Sell Cocaine while Armed on September 23, 2017

174.    On September 23, 2017, CS-1 was visiting VANDIVER at his new apartment located at 1288 Bayside Avenue #11, Woodbridge, Virginia. While there, CS-1 recorded Unnamed IGB Member 4 purchasing one ounce of cocaine from VANDIVER. VANDIVER was also recorded passing around an AR style pistol that he had in his possession in the apartment. This is believed to be the same pistol previously observed near a manufacturer's box labeled as a Smith and Wesson M&P15-22P. 22 caliber pistol.

54

175.    VANDIVER discussed the profits that could be made trafficking firearms to New York and mentioned that he previously sold firearms. He also mentioned purchasing firearms with high-capacity magazines and suppressors. VANDIVER reported he got away with it, but that quite a few people were recently arrested as part of a federal investigation into firearms trafficking from Virginia to New York (Individual 4).

176.    VANDIVER stated that while he was incarcerated in Rappahannock Regional Jail, he had a Puerto Rican cellmate that could buy "birds" (kilogram of cocaine) for $10,000 to $12,000, which they could then sell in this area for $33,000 to $35,000.

177.    CS-1 reported there would be a potential restructuring within the UBN involving IGB. The proposal involved the restructuring of the UBN into a northern and southern group. If this took place, the current IGB leader would be in charge of all Blood gangs from Florida to Philadelphia.

178.    CS-1 reported VANDIVER is purchasing a "four deuce" (4.5 ounces of cocaine) every day or every second day from NILES. Further, NILES now requires VANDIVER to purchase no less than 4.5 ounces at a time. CS-1 reported that VANDIVER on some days sells more than one "four deuce" in a day.

179.    During the above encounter with VANDIVER, CS-1 reported he traveled with VANDIVER to deliver cocaine to EDLER.

KK.    <u>VANDIVER sells Marijuana to Unnamed IGB Member 4 on September 26, 2017</u>

180.    CS-1 reported that while he was at 1288 Bayside Avenue #11, he observed VANDIVER sell one pound of marijuana to Unnamed IGB Member 4. While in the apartment, CS-1 observed four firearms to include a pistol with a fake suppressor, a red Smith & Wesson M&P 15 .22 caliber pistol, a .357 revolver, and a derringer style pistol. CS-1 captured a

55

photograph of the marijuana being sold to Unnamed IGB Member 4 prior to the transaction. CS-1 reported VANDIVER continues to sell drugs from the apartment with his roommate.

LL.   CS-1 Provides Intelligence on VANDIVER and NILES

181.   On September 29, 2017, at law enforcement direction, CS-1 socialized with VANDIVER. VANDIVER brought up Unnamed IGB Member 3 selling cocaine to CS- 4. VANDIVER believed CS-1 was still selling cocaine base to CS-4 and that if anyone should get their business it should be Unnamed IGB Member 3 because he has the most experience selling cocaine.

182.   VANDIVER received a phone call and placed it on speakerphone so CS-1 could hear the call. VANDIVER told the caller that he attempted to purchase two (2) zips (ounces) of cocaine from "RAY" (NILES), but NILES made him purchase four and a half. VANDIVER later explained to CS-1 that NILES had increased his cocaine distribution and would no longer sell cocaine in amounts less than 4.5 ounces. Later that day, CS-1 observed VANDIVER sell 1/8 ounce of cocaine to Co-Conspirator 4.

183.   On September 30, 2017, CS-1 observed VANDIVER sell 1/8 ounce of cocaine to EDLER.

184.   On October 1, 2017, CS-1 observed VANDIVER package an ounce of cocaine while at 1288 Bayside Avenue #11 and then sell it to an individual previously observed by CS-1 at an apartment on Berlin Court.

185.   CS-1 then travelled with VANDIVER to a co-conspirator's ("Co-Conspirator 5") house, which is located on Point Pleasant Lane, Dumfries, Virginia, where VANDIVER sold another ounce of cocaine to Co-Conspirator 5.

56

MM.   <u>CS-1 Purchased Approximately 500 grams of Cocaine Hydrochloride through VANDIVER and NILES from CHENNOR BAH on October 30, 2017</u>

186.   Law enforcement learned that NILES left the area on a one-way flight to Atlanta, Georgia. Upon learning this information, CS-1 was directed to order a large quantity of cocaine from VANDIVER in an attempt to have NILES direct a partner to deliver the cocaine to VANDIVER and CS-1.

187.   On October 30, 2017, CS-1 was provided with $20,000 in documented funds to purchase a quantity of cocaine. Law enforcement observed VANDIVER arrive at 1288 Bayside Avenue #11. At law enforcement direction, CS-1 met VANDIVER there.

188.   When CS-1 entered the apartment, CS-1 reported VANDIVER was on the phone with CAREW and that another male was present. VANDIVER could be heard saying, "someone brought back a bag with twenty bands in it, God is good" ($20,000). CS-1 proposed the purchase of "half a bird" (half a kilogram of cocaine) to VANDIVER. VANDIVER called someone, asked for a number, and stated he would call him on his (VANDIVER's) new phone. Call records reveal VANDIVER contacted his mother during this timeframe. CS-1 informed law enforcement that he overheard a conversation between VANDIVER and the other male present, in which VANDIVER informed the male that he was out of cocaine.

189.   VANDIVER confirmed the order with CS-1 and then placed a call. CS-1 reported VANDIVER was calling who he believed to be NILES. VANDIVER could be heard asking the subject believed to be NILES, "You still out of town?" Law enforcement knew that NILES had traveled to Atlanta prior to this date. The subject could be heard replying, "Yea." VANDIVER then asked, "Can I get with somebody or what?" VANDIVER stated, "Nigga, I

need half a joint." VANDIVER then asked the male on the other end of the call, "If I want half a joint can I get half a joint?" The subject replied, "Yea."

190.    CS-1 agreed to a price of $20,000 for half a kilogram of cocaine (500 grams). CS-1 was advised it would be approximately 1.5 hours until the cocaine was delivered. VANDIVER informed CS-1 (law enforcement monitored) that NILES traveled to Atlanta, Georgia to celebrate being off probation. This corroborated the above information that it was NILES that VANDIVER contacted.

191.    VANDIVER also reported that he (VANDIVER) had changed his phone number because he had received numerous jail calls from inmates. VANDIVER also discussed a prior robbery in the Summerland Apartment Complex in Woodbridge in which the victim threw a baby at VANDIVER and that the baby hit the wall. VANDIVER stated he became very upset and attempted to calm the baby down.

192.    At approximately 5:41 p.m., CS-1 informed law enforcement that the cocaine was currently in the parking lot and VANDIVER was in the process of counting money. VANDIVER was observed walking out of 1288 Bayside Avenue #11 carrying a light colored bag walking towards the dumpster area of the parking lot. A short time later, law enforcement observed VANDIVER return to 1288 Bayside Avenue #11 carrying a different bag. A silver Audi was observed departing the same area. Law enforcement observed this same Audi meet with NILES on August 31, 2017, just prior to NILES selling ten (10) ounces of cocaine to VANDIVER, who then manufactured cocaine base for CS-1.

193.    VANDIVER returned to the apartment, where he put on rubber gloves, opened the package, and then weighed the suspected cocaine on a digital scale. The suspected cocaine

58

was observed in a plastic food saver bag. VANDIVER and CS-1 reported the cocaine weighed approximately 502 grams.

194.    Law enforcement followed the Audi after it departed the area to the area of 2750 Green Ash Loop, Woodbridge, Virginia. During the course of this investigation, surveillance established that NILES uses this residence. The sole occupant of the Audi carried the light colored plastic bag into the building. A short time later, the same subject exited 2750 Green Ash Loop without the bag and departed in the Audi. The vehicle was then followed to the Smokey Bones parking lot in Woodbridge. The driver of an unidentified black Dodge Challenger entered the front passenger seat of the Audi. The parties separated again and the Audi was followed to a residence on Candlewood Court, Woodbridge, Virginia. The occupant of the Audi entered the residence, then exited and departed again in the vehicle. The vehicle was lost by surveillance for approximately 20 minutes.

195.    Law enforcement re-acquired surveillance of the Audi and coordinated a traffic stop by PWCPD. There were now two occupants in the Audi; however, law enforcement identified the driver as the same individual observed operating the vehicle throughout this operation. PWCPD identified the driver as CHENNOR MARLEY BAH ("BAH"). CS-1 was later displayed a photograph of BAH and CS-1 positively identified him as an individual he saw deliver cocaine to VANDIVER on prior occasions.

196.    The suspected cocaine hydrochloride purchased field tested positive and was submitted to the DEA Mid-Atlantic Laboratory to be analyzed.

197.    After identifying BAH, a criminal history check revealed he was arrested in 2012 by the DEA for dangerous drugs in Washington, D.C. BAH was also found guilty of two felony counts of Possession with Intent to Distribute Schedule I/II Drugs in the Commonwealth of

Virginia on January 10, 2014 and appears to be currently on supervised probation. A law enforcement database check also revealed BAH had been arrested in the past with another co-conspirator, Nathaniel BRUCE COBBOLD.

198.    A Virginia Employment Commission query revealed BAH has not had reported income since the fourth quarter of 2015.

199.    The Audi driven by BAH had been previously observed by law enforcement following NILES. On August 31, 2017, VANDIVER ordered 10 ounces of cocaine from NILES to manufacture into cocaine base for CS-1. Prior to NILES selling 10 ounces of cocaine to VANDIVER in Woodbridge, Virginia, he was observed by law enforcement in Alexandria, Virginia. There, NILES was observed pulling into a parking lot and meeting with an individual operating the same Audi BAH was operating. NILES met with the occupant of the Audi, then drove directly to a suspected stash house on Lynn Street in Woodbridge. From Lynn Street, NILES was followed to the transaction with VANDIVER and CS-1.

200.    On October 17, 2017, law enforcement observed NILES meet with a subject believed to be BAH in the same Audi in a Walmart parking lot in Woodbridge. NILES entered the front passenger seat of the vehicle.

201.    On November 16, 2017, law enforcement observed BAH in the same Audi arrive and depart from his residence at 12291 Granada Way in Woodbridge. BAH was again the driver of the vehicle and was followed from the residence to a gas station parking lot on Old Bridge Rd. BAH parked beside a female in a silver Ford Taurus, who was then observed entering BAH's vehicle. Approximately two minutes later, the female exited BAH's vehicle, reentered the Taurus, and both vehicles departed the area. Based on the training and experience of the law

enforcement officers present, the law enforcement officers believe that BAH provided the female with drugs. .

NN.   Social Media Role in Investigation

202.   During the course of this investigation, law enforcement reviewed publicly available social media and also used undercover social media accounts. This included, but was not limited to Facebook, Instagram, and iCloud. When available, law enforcement recorded social media posts that would not be stored by the providers. Search warrants were obtained for the accounts below. Below, I highlighted only a few relevant posts from one of VANDIVER's social media accounts.

203.   On April 29, 2016, a video of VANDIVER and CAREW rapping in an automobile together is shared.

204.   On September 1, 2016, VANDIVER shared a video of himself holding a TEC-9 style pistol.

205.   On May 24, 2017, VANDIVER shared a photograph of a quantity of marijuana with the caption, "Strain: Kush."

206.   On July 29, 2017, TERRELL sent a photograph of an Inter Ordnance Incorporated AK47 rifle with a high-capacity drum magazine attached and several rounds of 7.62x39 ammunition next to it to VANDIVER. On August 1, 2017, CS-1 would purchase this same firearm, determined to be stolen from Stafford County, Virginia, from TERRELL, through VANDIVER.

207.   On August 13, 2017, VANDIVER shared a video stating, "The police tried to get me right? They said your boy got a warrant right? Fuck them niggas blood, we still got bands on

deck." VANDIVER then took out bundles of money held together by rubber bands and laid them on the ground.

208.    On August 17, 2017, social media user "thenewbarber5" commented on a video shared by VANDIVER. The video was of VANDIVER holding a black pistol with a flashlight and suppressor attached. This appears to be the same pistol captured by CS-1 on the same date. [See Paragraph 155]. VANDIVER and the user of "thenewbarber5" also had a chat conversation on this date. VANDIVER told the user that it would cost him $1,250 for a "zone of ready" (ounce of crack) and that it was the last he had. VANDIVER then informed the user that next week he would have 64 grams of cocaine base form him for $1,700.

209.    On August 18, 2017, VANDIVER shared a video of himself standing on a chair in what appears to be the Wakewater Way address throwing money to the floor stating, "That nigga need a job? Tell that nigga come work for God damn Bando."

210.    On August 24, 2017, VANDIVER shared a video of himself smoking marijuana while walking around a black Dodge Challenger.

211.    On September 28, 2017, VANDIVER shared a photograph of himself holding five bundled stacks of US currency and using the stacks as a pillow.

## Conclusion

212.    Based upon the foregoing, I submit there is probable cause to support that from in and around March 2017 until the present date, in Prince William County, Virginia, within the Eastern District of Virginia and elsewhere, RASHOURN NILES, did unlawfully, knowingly, and intentionally combine, conspire, confederate and agree with others, both known and unknown, to unlawfully, knowingly and intentionally distribute and possess with the intent to

distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.  I therefore request a warrant be issued for NILES arrest.

Respectfully submitted,

Michael A. Fernald
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

SUBSCRIBED and SWORN to before me on _____ , 2017.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

63